## STATE v. GORDON WATKINS.

### (Filed 29 April, 1931.)

**Homicide D a—Whether pair of handcuffs was "deadly weapon" held question for jury, and instruction in this case was reversible error.**

As to whether a pair of handcuffs will be considered as a deadly weapon ordinarily depends upon their size, the material of which made, the relative strength and weakness of the assailant and assailed, and is usually a question for the jury, and under an indictment for a felonious killing, evidence that the assailant struck the deceased with a pair of handcuffs with other evidence tending to show that other causes resulted in the death of the deceased, an instruction "that an assault, when made with an instrument such as a pair of handcuffs would constitute in law an assault with a deadly weapon" is error, the question being for the determination of the jury.

CLARKSON, J., dissenting.

STACY, C. J., concurring *quœre de dubiis.*

ADAMS, CLARKSON, CONNOR and BROGDEN, JJ., approving another instruction as to manslaughter, assault, and assault with a deadly weapon.

APPEAL by defendant, Gordon Watkins, from *Sink, Special Judge,* at October Term, 1930, of WAKE.

Criminal prosecution tried upon the following bill of indictment:

"The jurors for the State upon their oath, present, that Gordon Watkins, Vance Mangum and Swannie Council, late of the county of Wake, on the 26th day of July, in the year of our Lord, 1930, with force and arms, at and in the county aforesaid, unlawfully, wilfully and feloniously did kill and slay Willie Bellamy, against the form of the statute in such case made and provided, and against the peace and dignity of the State."

Gordon Watkins, Vance Mangum and Swannie Council were supervisor, tractor driver and guard, respectively, of Prison Camp No. 5, Wake County, and Willie Bellamy was a prisoner assigned to work at said camp under a *mittimus* from the city court of Raleigh.

The evidence is in sharp conflict as to the character of treatment accorded the deceased by the defendants who had him in custody while a prisoner assigned to work on the public roads of Wake County. The State contended that Bellamy's death resulted from working him in the hot sun, while sick, without adequate food, and thereafter confining him in a sweat-box for disciplinary purposes. He died at St. Agnes Hospital, 11:30 p.m. Saturday, 26 July, 1930. The cause of death was stated by the attending physician to be, "Heat prostration with convulsive seizures, producing acute congestion of brain. Contributing cause, excessive hot weather."

Willie Bellamy was a large, colored man who weighed about 175 or 180 pounds. The evidence tends to show that he was unruly; sullen; impudent; declined to work; refused to obey orders; and that he tried to assault the defendant Watkins.

At the close of defendants' evidence, the State called two witnesses in rebuttal, one of them Ed. Perry, a fellow refractory prisoner, who testified that, when the prisoners came into the camp from their work at the end of the half-day, noon Saturday, 26 July, Willie Bellamy "tried to drink some water from the wash basin (provided for bathing purposes). Capt. Gordon (Watkins) knocked it out of his hands and asked him what he was trying to do. He hit him on the nose with a pair of handcuffs. They carried him to the dark cell and I did not see him any more." (Cross-examination) "Capt. Gordon (Watkins) hit him on the nose with handcuffs."

All the witnesses for the defendant, who were present at the time, denied that the defendant struck the deceased with his handcuffs. The only mark on the body of the deceased was a slight abrasion on the nose, which H. P. Thompson, witness for the State, thought was caused by a protruding plank in the solitary confinement cell. He said: "It stuck out about an inch and his nose was resting on that, and it looked like that was what might have caused it."

It is not contended that the blow on the nose with the handcuffs, if made, caused Bellamy's death or contributed thereto.

The court instructed the jury that "an assault, when made with an instrument such as a pair of handcuffs, would constitute in law an assault with a deadly weapon." Exception.

Verdict: Not guilty as to Vance Mangum and Swannie Council. Guilty of "an assault with a deadly weapon" as to Gordon Watkins.

Judgment: Imprisonment in county jail for a term of six months.

The defendant, Gordon Watkins, appeals, assigning errors.

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*

*John W. Hinsdale, Percy J. Olive and J. C. Little for defendant.*

STACY, C. J. The question of assault with a deadly weapon was not the principal matter debated on the hearing, but rather the charge of manslaughter, the main contention of the State being that Bellamy's death resulted from criminal neglect on the part of the defendants.

The only evidence to support the verdict "guilty of an assault with a deadly weapon" is the bare statement of Ed. Perry (repeated on cross-examination) that the defendant, Watkins, hit the deceased on the nose with a pair of handcuffs. There is no description by the witness of the size of the handcuffs, whether large or small, nor of their weight,

whether heavy or light, nor of their character, whether of metal, leather or rope, nor of the manner of their use, whether a light, glancing or full-faced blow was struck. Nor were the handcuffs themselves offered in evidence. It is not contended that the assault with the handcuffs caused the death of the deceased or contributed thereto.

In this state of the record, we think his honor erred in instructing the jury that "an assault, when made with an instrument such as a pair of handcuffs, would constitute in law an assault with a deadly weapon." *S. v. Smith,* 187 N. C., 469, 121 S. E., 737.

Any instrument which is likely to produce death or great bodily harm, under the circumstances of its use, is properly denominated a deadly weapon. *S. v. Craton,* 28 N. C., 165 at page 179. But where it may or may not be likely to produce such results, according to the manner of its use, or the part of the body at which the blow is aimed, its alleged deadly character is one of fact to be determined by the jury. *S. v. West,* 51 N. C., 505. "Where the deadly character of the weapon is to be determined by the relative size and condition of the parties and the manner in which it is used," the question is for the jury. *S. v. Archbell,* 139 N. C., 537, 51 S. E., 801; *S. v. Norwood,* 115 N. C., 789, 20 S. E., 712; *S. v. Huntley,* 91 N. C., 621. "If its character as being deadly or not depended upon the facts and circumstances it became a question for the jury with proper instructions from the court." *S. v. Beal,* 170 N. C., 764, 87 S. E., 416. See, also, *S. v. Hefner,* 199 N. C., 778; *S. v. Phillips,* 104 N. C., 786, 10 S. E., 463; *S. v. Porter,* 101 N. C., 713, 7 S. E., 902; *S. v. Collins,* 30 N. C., 407.

There are other exceptions appearing on the record worthy of consideration, but as they are not likely to arise on another hearing, we shall not consider them now.

New trial.

CLARKSON, J., dissenting: The evidence against the defendant was to the effect that the defendant, with Vance Mangum and Swannie Council, was brought to trial upon an indictment in the ordinary form for the homicide of Willie Bellamy. The Solicitor asked only for a verdict of manslaughter against these defendants. Upon this charge the jury acquitted Vance Mangum and Swannie Council and convicted Gordon Watkins of an assault with a deadly weapon.

C. S., 4639, is as follows: "On the trial of any person for rape, or any felony whatsoever, when the crime charged includes an assault against the person, it is lawful for the jury to acquit of the felony and to find a verdict of guilty of assault against the person indicted, if the evidence warrants such finding; and when such verdict is found the court shall have power to imprison the person so found guilty of an assault, for

any term now allowed by law in cases of conviction when the indictment was originally for the assault of a like character." *S. v. Hunt,* 128 N. C., at p. 586; *S. v. Williams,* 185 N. C., at p. 688. The defendant was convicted of "an assault with deadly weapon." This has been permissible since act of 1885, chap. 68, which is C. S., 4639, *supra,* if the evidence shall warrant such finding—which is not questioned in this case.

The defendants all had charge of the convicts, sentenced to work upon the public roads of Wake County, either as guards or otherwise. The State's evidence tended to show that the defendant, Willie Bellamy, was sentenced to work upon the public roads and was assigned to work at Camp No. 5. He was carried to this camp the afternoon of Monday, 21 July, and was put to work the following morning. The weather was hot and Bellamy, though a stout-appearing man, was evidently unaccustomed to hard labor in the hot sun. In consequence of his failure to work properly on the outside, he was given only bread and water for his supper that night and the same thing for breakfast Wednesday morning. On Wednesday he was brought back to the camp from working on the roads about noon and the county physician, Dr. R. W. Wilkerson, was called to see him. The doctor prescribed certain medicine and advised that he be kept in the next day. Friday morning he was carried out to the roads to work and when brought in that night, ate the usual rations. Watkins, the defendant, inquired about this and said that Bellamy did not work much and then put him in the sweat-box. The next morning, Saturday, he was given only bread and water and carried out to work, notwithstanding Dr. Wilkerson had told them to be easy with him the next few days, according to the defendant's own admission. The defendant, on cross-examination, testified: *"Although the doctor had told me he was mighty hot and very tender I put him in the sweat-box with shackles on and the chain locked down to the staple on the floor.* Blankets were in there, but I did not see if he could reach them for that was the steward's job. I have never made the statement that his hands were not locked behind him on Friday night. On Saturday morning I took him from the dark cell and gave him his hands. He went out Saturday morning and worked about two hours and about ten o'clock I went down to where he was and found him lying in the shade. I knew he was the man who Dr. Wilkerson *had told me to go easy with for three or four days,* and I confined him in the sweat-box in the middle of the day with another man. After Bellamy had been in the sweat-box for some time Mr. Thompson told me that he appeared to be sick. *I found him lying with his face down. I sent for some water and poured on him and unchained him.* I turned him over and when I put the water on him he said 'It feels good.' I thought he was playing with me; I

handcuffed him to find out to give him a chance to get up, he got up and turned around. I found that something was wrong with him and in such condition that I sent for the doctor. He was later brought out of the sweat-box by Mr. Thompson and put in the shade. Mr. Thompson came to my quarters and asked if he could take him out. I came out in the yard and saw them bringing him out." He was kept this way in the sweat-box all night.

While at work Saturday morning he was taken sick and brought in at noon. Notwithstanding his sickness, he was given only bread and water and confined in the sweat-box. The sweat-box was located in an open field about 40 or 50 yards from any trees. It was built out of oak timber about $1\frac{1}{2}$ inches thick, $3\frac{1}{2}$ feet wide, 6 feet high and 7 feet long. There was an opening around the top that had a wire screen on it and there was a big crack in the right-hand corner, at the entrance to the door. The roof was of boards and tar paper. It did not have any tin roof at that time. After he had been thus put in the sweat-box, in the middle of an exceedingly hot day, he grew so much worse that the doctor was sent for and he was carried to St. Agnes Hospital in Raleigh, where he died that night. When he was carried to the hospital, his temperature was 110 and he was unconscious. The only bruise that was found upon him at that time, *was a scratched place across his nose, $1\frac{1}{4}$ inches long and $\frac{3}{4}$ of an inch wide*. It appears that this wound was caused by the defendant, Watkins, striking him at noon, Saturday, with a pair of handcuffs.

Ed. Perry, testified, in part: "I was a prisoner at Camp No. 5 during week of July 21st to 26th. On Saturday when we got to the camp and got to the wash basin he (Bellamy) tried to drink some water from the wash basin. Capt. Gordon (Watkins) knocked it out of his hand and asked him what he was trying to do. He hit him on the nose with a pair of handcuffs. Capt. Vance went up behind him and knocked him on the ground and they carried him to the dark cell and I did not see him no more."

This appeal is narrowed down to one question—under the facts and circumstances of this case did the "handcuffs" constitute a deadly weapon? The court below, after reciting the contentions of the State in accordance with the evidence as above set forth, charged the law of criminal negligence, manslaughter and the following: "An assault is an attempt to do a corporate hurt to another; it is unlawful physical force applied to another and an assault, as defined to you, when made with an instrument such as a pair of handcuffs, would constitute in law an assault with a deadly weapon. An attempt to do a corporate hurt to another without the use of anything other than the human person is in law a simple assault."

In *S. v. Collins,* 30 N. C., at p. 412, 413, the court below left it to the jury to say "Whether a knife two inches and a half long was a deadly weapon." On appeal this Court held this was so as a matter of law.

In *S. v. Huntley,* 91 N. C., at p. 620, is the following: "Then what is a deadly weapon? It must be an instrument used, or that may be used, for the purpose of offense or defense capable of producing death. Some weapons are *per se deadly;* others, owing to the manner in which they are used, become deadly. A gun, a pistol, or dirk-knife, is of itself deadly; a small pocket knife, a walking cane, a switch of the size of a woman's finger, if strong and tough, may be made a deadly weapon if the aggressor shall use such instrument with great or furious violence, and especially, *if the party assailed should have comparatively less power than the assailant, or be helpless and feeble."* (Italics mine.)

In *S. v. Archbell,* 139 N. C., at p. 539, it is said: "An instrument which might be harmless upon a strong man, may become deadly when used upon a frail and delicate woman." *S. v. Beall,* 170 N. C., at p. 766; *S. v. Hefner,* 199 N. C., 778.

In *S. v. Smith,* 187 N. C., at p. 470, *Stacy, J.,* writing for a unanimous Court, said: *"Any instrument which is likely to produce death or great bodily harm, under the circumstances of its use, is properly denominated a deadly weapon. S. v. Craton, 28 N. C., p. 179. The deadly character of the weapon depends sometimes more upon the manner of its use, and the condition of the person assaulted, than upon the intrinsic character of the weapon itself. S. v. Archbell, 139 N. C., 537; S. v. Sinclair, 120 N. C., 603; S. v. Norwood, 115 N. C., 789."* (Italics mine.)

Webster's New International Dictionary defines "handcuff" as follows: "A metal ringlike fastening which can be locked around the wrist, usually connected by a chain or bar with one on the other wrist." The Century Dictionary gives a picture of the metal handcuff with the key and defines it as follows: "A shackle or fastening for the hand consisting of a divided metal ring placed about and locked upon the wrist; a manacle. Handcuffs are used in pairs, one for each wrist, the two being connected by a short chain or jointed bar."

In the present case, the defendant's own testimony was to the effect that the doctor told defendant "to go easy with him for three or four days." "Although the doctor had told me he was mighty hot and very tender I put him in the *'sweat-box'* with shackles on and the chain locked down to the staple on the floor." He was left in this sweat-box all Friday night. On Saturday, 26 July, he was taken from the "dark cell." He had been in camp since Monday evening, 21 July, working in extremely hot weather. About the middle of Saturday, the same day he was "confined" in the sweat-box with another man, defendant found

him lying with his face down. Defendant "unchained" him and poured some water on him. The prisoner Bellamy said: "It feels good." That night the prisoner died about 11:30 o'clock, a half hour after reaching the hospital they "took his temperature and it went to the top of the thermometer at 110 . . . he was unconscious."

Ed. Perry testified that when Bellamy, the prisoner, got to the wash basin that Saturday morning he tried to drink some water from the wash basin, no doubt caused by the overpowering thirst caused from his fever. *Defendant hit him, on the nose with a pair of handcuffs.* The bruise found upon him was a scratched place across his nose 1½ inches long and ¾ of an inch wide. It is a matter of common knowledge that handcuffs are of metal, it is so defined in the dictionaries. Everybody who has had any experience in the courts or elsewhere knows what it is without it being produced on trial. In fact the defendant did not request the court below to charge that under the facts and circumstances of this case it was not a deadly weapon. From its use on a prisoner weakened by fever, shackled and manacled all night before and the other evidence of his depleted condition the judge in the court below thought from the circumstances of its use that it was a deadly weapon, and as was said by *Stacy, J.,* in the *Smith case, supra, any* instrument which is likely to produce death or *great bodily harm* under the *circumstances* of its use is *properly* denominated a *deadly weapon.*

· The position of the main opinion in my judgment is technical in the extreme. The record of defendant's conduct and his own testimony shows reckless, inhuman, conduct to the prisoner—weakened by being manacled and shackled, and placed in the sweat-box and worked in the hot summer sun, and then struck by defendant with the handcuffs when seeking to quench his feverish thirst by even trying to drink out of a wash basin. In less than twelve hours after this assault the prisoner was dead, with a fever at 110. I think defendant has been rightly convicted by a jury of his own county.

Mr. Elihu Root, a great lawyer and statesman, said: "Every lawyer knows that the continued reversal of judgments, the sending of parties to a litigation to and fro between the trial courts and the appellate courts, has become a disgrace to the administration of justice in the United States. Everybody knows that the vast network of highly technical rules of evidence and procedure which prevails in this country serves to tangle justice in the name of form. It is a disgrace to our profession. It is a disgrace to our law and a discredit to our institutions." This statement is perhaps too radical, but it should be a warning.

The language in the dissenting opinion of *Stacy, C. J.,* in *S. v. Strickland, ante,* 630, is most applicable in the present case: "Even in

criminal prosecutions, where, for obvious reasons, matters of procedure are required to be observed with greater particularity than in civil actions, bills and warrants are no longer subject to *quashal* 'by reason of any informality or refinement,' C. S., 4625. Many cases have been upheld in the face of far more grievous defects than the one here alleged. *S. v. Beal,* 199 N. C., 278; *Jennette v. Hovey,* 182 N. C., 30, 108 S. E., 301. . . . The case turns on a *Lilliputian* point made *Brobdingnagian.* That is all there is in it. Why debate it further? *Cui Bono?"*

STACY, C. J., concurs *quære de dubiis:* While not pressed on the argument, or debated on brief, it may be doubted whether a more fundamental question than all the rest, does not arise on the face of the record proper. It is this: Is a verdict of assault with a deadly weapon supported by a statutory indictment for murder which fails to allege that the homicide was committed by means of assault and battery or assault with a deadly weapon? This may be doubted. *In re McLeod,* 23 Idaho, 257; 43 L. R. A. (N. S.), 813; *Watson v. State,* 116 Ga., 607, 43 S. E., 32, 21 L. R. A. (N. S.), 1, and note; 31 C. J., 866; 14 R. C. L., 210.

It is not essential to a valid indictment for murder that the means used be set out in the bill. The abbreviated statutory form is permissible and sufficient. *S. v. Gilchrist,* 113 N. C., 673, 18 S. E., 319; *S. v. Covington,* 117 N. C., 834, 23 S. E., 337; *S. v. Matthews,* 142 N. C., 621, 55 S. E., 342. But it is a rule of universal observance in the administration of the criminal law that a defendant cannot be charged with one offense and convicted of another not included therein. *People v. Adams,* 52 Mich., 24; *S. v. Harbert,* 185 N. C., 760, 118 S. E., 6. If this were not so, pleas of former jeopardy, former conviction and former acquittal would vanish from the books. 8 R. C. L., 110.

True, it is provided by C. S., 4639 that "on the trial of any person for rape, or any felony whatsoever, when the crime charged includes an assault against the person, it is lawful for the jury to acquit of the felony and to find a verdict of guilty of assault against the person indicted, if the evidence warrants such finding." And it has been said in a number of cases, notably *S. v. Williams,* 185 N. C., 685, 116 S. E., 736, *S. v. Smith,* 157 N. C., 578, 72 S. E., 853, *S. v. Fritz,* 133 N. C., 725, 45 S. E., 957, and *S. v. Hunt,* 128 N. C., 584, 38 S. E., 473, that on an indictment for murder, the defendant may be convicted of any one of the three degrees of an unlawful homicide, to wit, murder in the first degree, murder in the second degree, or manslaughter, and even of an assault with a deadly weapon, or of a simple assault, "if the evidence shall warrant such finding," when he is not acquitted altogether. "It is as if all these counts were separately set out in the bill (for it includes all of them), *S. v. Gilchrist,* 113 N. C., 673." *S. v. Hunt, supra.* But in

all of these cases, and others of like import, the observation is carefully made that, to warrant one of the lesser verdicts, assault with a deadly weapon or simple assault, the crime charged must include an assault against the person as an ingredient. *S. v. Fritz, supra; S. v. Lee,* 192 N. C., 225, 134 S. E., 458.

Again, it is provided by C. S., 4640 that "upon the trial of any indictment the prisoner may be convicted of the crime charged therein or of a less degree of the same crime, or of an attempt to commit the crime so charged, or of an attempt to commit a less degree of the same crime." But the lesser offense for which a conviction may be had on an indictment for a higher one, must either be included in the general charge of the greater, or the indictment must contain sufficient allegations to constitute a charge of the lesser. *Watson v. State, supra.* Indeed, a conviction may not be had for an assault on an indictment for murder when it appears that not the assault charged but another caused the death. This would be a fatal variance between the allegation and the proof. *S. v. Harbert, supra.*

In a case like the present, where it is sought to fall back upon the lesser offense, assault and battery or assault with a deadly weapon, in case the greater, murder or manslaughter, is not made out, it is not unreasonable to require that the indictment for murder be so drawn as necessarily to include an assault and battery, or assault with a deadly weapon, or that it contain a separate count to this effect. *Scott v. State,* 60 Miss., 268. The decisions which hold that it would be violative of a defendant's constitutional right to charge him with the commission of one crime and convict him of another and different one, are not at variance with this requirement, but are accordant therewith. *S. v. Wilkerson,* 164 N. C., 432, 79 S. E., 888.

The Constitution provides that in all criminal prosecutions every man has the right to be informed of the accusation against him, and that no person shall be put to answer any criminal charge, . . . but by indictment, presentment, or impeachment. Art. I, secs. 11 and 12. A defendant is entitled to be informed of the accusation against him, and to be tried accordingly. *S. v. Ray,* 92 N. C., 810; *S. v. Snipes,* 185 N. C., 743, 117 S. E., 500; *S. v. Whedbee,* 152 N. C., 770, 67 S. E., 60. "These principles," said *Nash, C. J.,* in *S. v. Moss,* 47 N. C., 67, "are dear to every freeman; they are his shield and buckler against wrong and oppression, and lie at the foundation of civil liberty; they are declared to be *rights* of the citizens of North Carolina, and ought to be vigilantly guarded."

On an indictment which charges only that the defendant did feloniously kill and slay the deceased, a conviction of assault with a deadly weapon cannot be sustained, unless an assault with a deadly weapon is

perforce covered by the charge. *S. v. Vineyard,* 85 W. Va., 293, 101 S. E., 440. And if it be conceded that a charge of murder *ex vi termini* includes, as an ingredient, an assault against the person, would not a conviction of assault, on such indictment, necessarily be limited to the assault which contributed to the homicide? If not, may the defendant, under a charge of murder, be convicted of an assault against the person, of any character, committed within the period of the statute of limitations?

The point may be illustrated by the instant case. Conceding that the placing of Willie Bellamy in the dark cell was an assault against him, under the circumstances disclosed by the record, which contributed to his death, would not this be the assault covered by the bill, and not some other assault which neither caused nor contributed to his death?

Take another illustration: Two men engage in an affray in which each assaults the other with a deadly weapon, but neither is seriously injured. Months afterwards they meet again, one shoots the other and kills him. On an indictment for the murder, would it be permissible to convict the defendant of an assault committed in the affray?

Involuntary manslaughter may be committed without the deceased being assaulted, as for example, where a homicide occurs as a result of some negligent or culpable omission of duty. *S. v. Rountree,* 181 N. C., 535, 106 S. E., 669; *S. v. McIver,* 175 N. C., 761, 94 S. E., 682. Perhaps the most that can be said of the present indictment is, that it charges an offense of which assault with a deadly weapon may or may not be an ingredient. *S. v. Thomas,* 65 N. J. L., 598. It does not set out murder or manslaughter by assault, and it cannot be held to cover assault and battery, or assault with a deadly weapon, as an independent averment. *People v. Adams, supra.*

Of course, where the means used to commit the homicide is set out in the bill and this includes an assault with a deadly weapon, it is not likely that the question here debated would ever arise.

Nothing said in this opinion is in any way binding on the court. The question is not decided.

JUSTICES ADAMS, CLARKSON, CONNOR, and BROGDEN, while not inclined to debate an academic question, deem it not improper to say that upon the evidence appearing in the record the following instruction, which was given the jury in this case, is in their opinion free from error: "You may bring in either one of four verdicts as to the defendant Watkins, as you may find the facts to be from the evidence, under the law as given you by the court: First, manslaughter, assault with a deadly weapon, simple assault, or not guilty."