STATE OF NORTH CAROLINA v. NATHANIEL LEE TORAIN

No. 284A85

(Filed 5 March 1986)

1. **Rape § 6— first degree rape—utility knife as dangerous or deadly weapon—instruction proper**

   The trial court in a first degree rape case did not err in instructing the jury that "a utility knife is a dangerous or deadly weapon," and there could therefore be no "plain error" as contended by defendant, where the victim, who at the time of the assault was wearing only a one-piece bathing suit, testified that the blade of the knife was a typical razor blade about one inch long; she had seen her stepfather use such a knife to cut carpet or sheetrock and realized it was very sharp; and the knife had been used to cut through cardboard cartons, slice yarn off textile beams, and sever the victim's nylon bathing suit straps and was therefore capable of cutting into exposed flesh.

2. **Criminal Law § 67.1— rape victim's identification of defendant by voice—admissibility of evidence**

   The trial court in a rape case did not err in allowing the State to recall the victim, following the close of defendant's evidence, to testify that, after hearing defendant's voice in court, she recognized it as being the voice of the man who attacked her eight months earlier, since defendant requested and was allowed a recess to research his objection but was unable to locate any authority for his position; defendant was allowed to conduct a *voir dire* examination of the victim; and the in-court voice identification was of independent origin and not unduly suggestive.

BEFORE *Bowen, J.,* at the 18 February 1985 Criminal Session of Superior Court, ORANGE County, defendant was convicted of first-degree rape and acquitted of second-degree kidnapping. Upon the imposition of a sentence of life imprisonment, defendant

appeals to this Court as a matter of right, pursuant to N.C.G.S. § 7A-27(a). Heard in the Supreme Court 18 December 1985.

*Lacy H. Thornburg, Attorney General, by Evelyn M. Coman, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Louis D. Bilionis, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

Defendant raises two issues for resolution by this Court. He first contends that he was deprived of his constitutional rights to due process and a fair trial by jury when the trial court, in its charge to the jury on the offense of first-degree rape, removed from the case an essential element of the crime—that the defendant employed or displayed a dangerous or deadly weapon. Second, defendant argues that it was error for the trial judge to allow the State to recall the victim, following the close of defendant's case, to testify that after hearing defendant's voice in court, she recognized it as being the voice of the man who attacked her eight months earlier.

I.

Defendant argues that, by instructing the jury that "a utility knife is a dangerous or deadly weapon," the trial judge erroneously created a mandatory presumption, removing a question of fact from the jury, and thereby relieving the State of its burden of proving an essential element of first-degree rape beyond a reasonable doubt.

Defendant admits that by his failure to object at trial to the contested instruction, he has waived his right to assign it as error on appeal. N.C.R. App. P. Rule 10(b)(2). However, defendant urges this Court to find that the trial judge committed "plain error" in charging that "a utility knife is a dangerous or deadly weapon." *See State v. Odom*, 307 N.C. 655, 300 S.E. 2d 375 (1983).

The State's evidence tended to show that on 18 June 1984, after completing her shift at North Carolina Memorial Hospital, Kimberly Brock Ashworth drove to the Homestead Community Center in Orange County at approximately 1:00 p.m. to relax, read, and sunbathe. She set up a lounge chair by the swimming

pool and spent several hours reading, listening to music, and napping. She had stopped by her boyfriend's mother's home on the way to the Community Center and had been planning her wedding; "I was tired of that, and I just wanted to relax; and that's what I did that day most of the day." At approximately 3:30 p.m., Ms. Ashworth got out of her lounge chair to rinse off and had just sat back down in the chair when she heard a creaking noise she recognized as one of the doors to the pool house which was behind her. While still seated, she stretched around in the chair to see who was coming through the door into the fenced pool area and saw a man running toward her, crouched down, and wearing a stocking over his face. She thought someone was playing a joke on her until he grabbed her from behind; she tried to get up before he reached her but could not do so because the chair was so low. The man was wearing a green, short-sleeved shirt with an orange patch on the pocket, and darker colored pants. Ms. Ashworth was unable to describe his facial features because the stocking mask obscured his face, but she testified that her assailant smelled of oil or kerosene and had rough hands.

The man grabbed Ms. Ashworth's face with one hand and put his other arm around her, pulling her out of the chair. He kept repeating, "I've got a knife. I'm going to kill you. Get up. Get up." The man put a knife in front of Ms. Ashworth's face "enough so I could see it." She recognized the type of knife the man was showing her and described it at trial as follows:

A. It was a, had a long gray handle on it. And it was a razor type edge. The knife was, it was something that you would use to cut carpet or sheetrock or something like that. My stepfather is a carpenter. So I've seen him use several things, several types of knives like that; and so I realized what it was; and I realized that it was very sharp.

Q. Was this, this knife that this man had, was it a rather plain article or was there anything distinctive about it or unusual about it?

A. It had a little switch where you could flick the blade in and out; and around that switch, it was worn pretty much where the thumb had been put there; and the blade was not a new blade. It had been used I could tell that. It had some

articles on it, some types of marks on it that I could tell that it was not a knew [sic] blade?

Q. Now, how was he holding this knife relative to you?

A. He had it like this; and it was this close to my throat; but at first he put it up where I could see it; and then it was down closer to my throat.

Q. Do you have an opinion as to about how long the blade was on that knife?

A. It was a typical type razor blade, triangular blade. It was no more than an inch long.

Q. Now, did he at any time press this knife so that it was against your person?

A. Only after he got me in the woods, the, the handle of the blade was touching my neck; but the blade itself was not on my neck. It, I didn't feel that, the thin tip. It was the thicker metal of the handle moreso [sic] than the thinner blade, the thinner part of the blade.

After her attacker showed Ms. Ashworth the knife, he began pushing her toward the pool house door. He held her with her back against his body and his arm around her neck, pinning her head to his chest and nudging her along with his knee. The man pushed Ms. Ashworth through the pool house and out another door toward the circular driveway and then into the woods. When she tripped several times, the man threatened again to kill her. Once they got into the woods, the man pushed Ms. Ashworth down to her knees and, with one hand still over her face, put the knife against her back and cut the straps off her bathing suit, causing it to fall down. The man pulled off the bathing suit and tied it around Ms. Ashworth's face. He asked her if she could see him and she said "no." He grabbed her arms and tied them behind her back with "a stocking type binder." The man then engaged in vaginal intercourse with Ms. Ashworth. When he was finished, he told Ms. Ashworth to stay there for fifteen minutes and she volunteered to "count out loud" so that he could hear her and be assured that she would not try to see him. After two or three minutes, Ms. Ashworth was able to free her hands and pull the bathing suit off her face and down around her neck. She got her

lab coat from her car and called her boyfriend's mother from the pool house phone.

When law enforcement officers arrived at the Community Center, Ms. Ashworth led them to the place where she'd been assaulted. She was then taken to the emergency room at North Carolina Memorial Hospital where medical personnel removed the bathing suit from around Ms. Ashworth's neck and the stocking from her right wrist. Dr. Arnold Barefoot collected evidence for the standard SBI rape evidence kit.

The State elicited the testimony of several SBI experts regarding results of their comparisons of hair, fiber, and body fluid samples collected from the crime scene and from the victim with known samples collected from the defendant and the utility knife identified by Ms. Ashworth as the weapon employed by her assailant.

The State offered the testimony of defendant's supervisor at D&S International and that of a co-worker to the effect that defendant had been at work on 18 June 1984 and had stayed until approximately 2:00 p.m. The supervisor, Mr. Boone, and co-worker, Bobby Loy, both testified that defendant's job at D&S was a dirty, oily, and greasy one and that D&S employees use a box cutter or carton cutter to open cardboard cartons and to cut yarn off textile beams being prepared for reshipment.

Mr. Loy testified that when he came to work on the morning of 19 June 1984, he found a carton cutter lying on a box outside the office. He returned the cutter to its usual place in Mr. Boone's desk drawer. Defendant had not yet reported to work when Mr. Loy arrived that morning.

Mr. Boone positively identified the carton cutter, previously identified by Ms. Ashworth as the one with which she had been assaulted, as the cutter he normally kept in his office drawer at D&S for use by his employees, including the defendant. The carton cutter was admitted into evidence.

Defendant offered evidence tending to show that he was not at or near the Homestead Community Center on the afternoon of 18 June 1984 and that he was not the perpetrator of the attack. Following defendant's testimony, the State was allowed to call

Ms. Ashworth in rebuttal. She testified that she recognized defendant's voice as being that of the man who assaulted her.

Defendant was convicted of first-degree rape and acquitted of second-degree kidnapping.

The record before us contains no indication that any written request for specific jury instructions was submitted to the trial judge. In instructing the jury on the elements of first-degree rape, the trial judge charged that the fourth element the State must prove beyond a reasonable doubt is "that the defendant used or displayed a dangerous or deadly weapon. A utility knife is a dangerous or deadly weapon." The case was not submitted to the jury until the following day. Before the jury retired to begin its deliberations, the trial judge inquired of counsel, "Are there any specific requests for corrections or additions to the charge from the State or the defendant?" Defense counsel responded, "No sir. Your Honor."

[1] In his brief and argument before this Court, defendant now contends that the instruction that "a utility knife is a dangerous or deadly weapon" amounted to a violation of defendant's constitutional rights to due process and a fair trial by jury in that, by charging, in effect, that a utility knife is a dangerous or deadly weapon *as a matter of law*, the trial judge impermissibly relieved the State of its burden of proving that element beyond a reasonable doubt. Defendant acknowledges his failure to object at trial and his noncompliance with Rule 10(b)(2), but contends that the instruction amounted to "plain error" under *State v. Odom*, 307 N.C. 655, 300 S.E. 2d 375 (1983) (where defendant fails to preserve error in a jury instruction by not making a timely objection pursuant to N.C.R. App. P. Rule 10(b)(2), this Court must examine the whole record to determine whether the error amounted to "plain error"). A prerequisite to our engaging in a "plain error" analysis is the determination that the instruction complained of constitutes "error" at all. Then, "[b]efore deciding that an error by the trial court amounts to 'plain error,' the appellate court must be convinced that absent the error the jury probably would have reached a different verdict." *State v. Walker*, 316 N.C. 33, 39, 340 S.E. 2d 80, 83 (1986). We conclude that the challenged instruction in this case did not constitute error at all, and therefore a "plain error" analysis is inappropriate.

Defendant's contention is that the challenged instruction amounted to a mandatory conclusive presumption which unconstitutionally relieved the State of its burden of proving each element of first-degree rape beyond a reasonable doubt. Defendant relies primarily upon the recent United States Supreme Court's opinion in *Francis v. Franklin,* --- U.S. ---, 85 L.Ed. 2d 344 (1985). In *Francis,* defendant's sole defense to a charge of "malice murder" was a lack of the requisite intent to kill; he offered substantial circumstantial evidence tending to support his defense. The trial judge instructed the jury, *inter alia:*

> The acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts, but the presumption may be rebutted.

*Id.* at ---, 85 L.Ed. 2d at 351.

After discussing the mandates of *In re Winship,* 397 U.S. 358, 25 L.Ed. 2d 368 (1970); *Sandstrom v. Montana,* 442 U.S. 510, 61 L.Ed. 2d 39 (1979); and *Ulster County Court v. Allen,* 442 U.S. 140, 60 L.Ed. 2d 777 (1979), the Court held in *Francis:*

> Because a reasonable juror could have understood the challenged portions of the jury instruction in this case as creating a mandatory presumption that shifted to the defendant the burden of persuasion on the crucial element of intent, and because the charge read as a whole does not explain or cure the error, we hold that the jury charge does not comport with the requirements of the Due Process Clause.

*Francis v. Franklin,* --- U.S. at ---, 85 L.Ed. 2d at 360.

The United States Supreme Court explained in *Sandstrom,* 442 U.S. at 521, 61 L.Ed. 2d at 49, and in *Francis,* --- U.S. at ---, 85 L.Ed. 2d at 353, that in addressing the issue of " 'whether the challenged jury instruction had the effect of relieving the State of the burden of proof [beyond a reasonable doubt] on the critical question of state of mind' by creating a mandatory presumption of intent upon proof by the State of other elements of the offense," the "threshold inquiry" is a determination of the nature of the presumption described by the instruction. This mandate assumes,

of course, that the jury instruction amounts to some kind of presumption in the first place.[1]

This Court has had occasion to address the issue of the constitutionality of presumptions in criminal cases in *State v. Joyner,* 312 N.C. 779, 324 S.E. 2d 841 (1985), and *State v. White,* 300 N.C. 494, 268 S.E. 2d 481, *reh'g denied,* 301 N.C. 107, 273 S.E. 2d 443 (1980), in light of *Ulster County Court v. Allen,* 442 U.S. 140, 60 L.Ed. 2d 777 (1979). These cases explain that presumptions of *elemental* facts, under proper circumstances, arise from the State's proof, beyond a reasonable doubt, of certain *basic* facts.[2]

---

1. The United States Supreme Court provided the following definitions in *Francis v. Franklin,* --- U.S. ---, 85 L.Ed. 2d 344:

> "A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. [A mandatory presumption may be either conclusive or rebuttable. A conclusive presumption removes the presumed element from the case once the State has proven the predicate facts giving rise to the presumption. A rebuttable presumption does not remove the presumed element from the case but nevertheless requires the jury to find the presumed element unless the defendant persuades the jury that such a finding is unwarranted. (Citation omitted.)] A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion."

*Id.* at ---, 85 L.Ed. 2d at 353 (material within brackets appears at 353, n. 2). *See also State v. White,* 300 N.C. 494, 503, 268 S.E. 2d 481, 487, *reh'g denied,* 301 N.C. 107, 273 S.E. 2d 443 (1980).

2. In *Joyner,* the "basic" fact was that the robbery was accomplished with what appeared to the victim to be a firearm; the "elemental" fact arising by presumption therefrom was that a life was endangered or threatened. *State v. Joyner,* 312 N.C. at 783, 324 S.E. 2d at 844. In *White,* the "basic" fact was the birth of a child to the mother during her marriage to her husband; the "elemental" fact arising by presumption therefrom was that the mother's husband was the child's father. *State v. White,* 300 N.C. 494, 268 S.E. 2d 481.

Other examples of presumptions which have been thought to arise from proof of "basic" facts in criminal cases are: *Francis v. Franklin,* --- U.S. ---, 85 L.Ed. 2d 344 (1985) ("basic" fact: natural and probable consequences of a voluntary act; "elemental" fact: intent); *Sandstrom v. Montana,* 442 U.S. 510, 61 L.Ed. 2d 39 (1979) (same); *United States v. Ben M. Hogan Co., Inc.,* 769 F. 2d 1293 (8th Cir. 1985) ("basic" fact: bid rigging; "elemental" fact: effect on interstate commerce); *State v. Hankerson,* 288 N.C. 632, 220 S.E. 2d 575 (1975), *rev'd,* 432 U.S. 233, 53 L.Ed. 2d 306 (1977) ("basic" fact: use of a deadly weapon; "elemental" fact: malice/unlawfulness).

The constitutionality of jury instructions on these presumptions, however denominated, depends upon the clarity of the instructions which must not be capable of interpretation by a reasonable juror to mean that the burden of persuasion has shifted to defendant upon the State's proof of the "basic" fact. *See Francis v. Franklin,* --- U.S. at ---, 85 L.Ed. 2d at 360.

"Elemental" facts are, of course, *facts* which are essential elements of a criminal offense, e.g., intent, paternity, life endangered or threatened, malice (where it becomes an element by reason of defendant's asserting a lack thereof, as in a "heat of passion" defense). Elements of criminal offenses present questions of *fact* which must be resolved by the *jury* upon the State's proof of their existence beyond a reasonable doubt.

Defendant here assumes that the character of the instrumentality, the carton cutter, is an element of the offense of first-degree rape and that whether or not the instrumentality was a "dangerous or deadly weapon" is therefore always a question of fact for the jury. This assumption is incorrect.

It has long been the law of this state that "[w]here the alleged deadly weapon and the manner of its use are of such character as to admit of but one conclusion, the question as to whether or not it is deadly . . . *is one of law, and the Court must take the responsibility of so declaring." State v. Smith*, 187 N.C. 469, 470, 121 S.E. 737, 737 (1924) (emphasis added); *State v. West*, 51 N.C. 505 (6 Jones) (1859); *State v. Roper*, 39 N.C. App. 256, 249 S.E. 2d 870 (1978). In fact, where the trial judge has left to the jury the question of the dangerous or deadly character of a weapon of "such character as to admit of but one conclusion," our appellate courts have often found harmless error (allowing jury to decide nature of instrumentality is error in some cases, but the higher burden of proof (beyond a reasonable doubt) is advantageous to defendant and is therefore harmless error). For example, in *State v. Collins*, 30 N.C. 407 (8 Ired.) (1848), the trial judge left it to the jury to decide whether a knife with a two and one-half inch blade was a deadly weapon. This Court stated that, although the trial judge correctly defined "deadly weapon,"

> the error of his Honor consisted in leaving that to the jury as a question of fact which is strictly one of law. . . . Whether the instrument used was such as is described by the witnesses, where it is not produced, or, if produced, whether it was the one used, are questions of fact; but, these ascertained, its character is pronounced by law.

"[P]resumptions generally are confined to facts characterized as elements of the offense." Jeffries & Stephan, *Defenses, Presumptions, and Burden of Proof in the Criminal Law*, 88 Yale L.J. 1325, 1338 (1979).

*Id.* at 412. *See also State v. Perry,* 226 N.C. 530, 39 S.E. 2d 460 (1946) (trial court could properly have found brick was deadly weapon as a matter of law; defendant cannot complain that trial judge left question to jury); *State v. McLaurin,* 12 N.C. App. 23, 182 S.E. 2d 280 (1971) (same; board); *State v. Cox,* 11 N.C. App. 377, 181 S.E. 2d 205 (1971) (same; knife with three-inch blade is deadly weapon per se). *Cf. State v. McKinnon,* 54 N.C. App. 475, 283 S.E. 2d 555 (1981) (where evidence uncontradicted that defendant's blow with a small pocketknife caused victim's lung to collapse, trial court should have instructed that pocketknife was a deadly weapon as a matter of law; no error in failing to instruct on misdemeanor assault); *accord State v. Daniels,* 38 N.C. App. 382, 247 S.E. 2d 770 (1978) (blackjack).

A dangerous or deadly weapon "is generally defined as any article, instrument or substance which is likely to produce death or great bodily harm." *State v. Sturdivant,* 304 N.C. 293, 301, 283 S.E. 2d 719, 725 (1981). Only "where the instrument, according to the manner of its use or the part of the body at which the blow is aimed, may or may not be likely to produce such results, its allegedly deadly character is one of fact to be determined by the jury." *State v. Joyner,* 295 N.C. 55, 64-65, 243 S.E. 2d 367, 373 (1978) (Pepsi-Cola bottle). *See also State v. Strickland,* 290 N.C. 169, 225 S.E. 2d 531 (1976) (plastic bag); *State v. Watkins,* 200 N.C. 692, 158 S.E. 393 (1931) (metal handcuffs); *State v. Beal,* 170 N.C. 764, 87 S.E. 416 (1915) (rock); *State v. Archbell,* 139 N.C. 537, 51 S.E. 801 (1905) (buggy trace); *State v. Sinclair,* 120 N.C. 603, 27 S.E. 77 (1897) (pine weather boarding); *State v. McGee,* 47 N.C. App. 280, 267 S.E. 2d 67, *disc. rev. denied,* 301 N.C. 101, 273 S.E. 2d 306 (1980) (tire tool); *State v. Whitaker,* 29 N.C. App. 602, 225 S.E. 2d 129 (1976) (broom handle, knife, nail clippers).

A variety of instrumentalities have been recognized in this state to be deadly (or dangerous) as a matter of law. *E.g., State v. Hefner,* 199 N.C. 778, 155 S.E. 879 (1930) (blackjack); *State v. Smith,* 187 N.C. 469, 121 S.E. 737 (1924) (baseball bat); *State v. Beal,* 170 N.C. 764, 87 S.E. 416 (1915) ("gun, pistol, large knife, bar of iron, a club or bludgeon"); *State v. Phillips,* 104 N.C. 786, 10 S.E. 463 (1889) (club); *State v. Collins,* 30 N.C. 407 (8 Ired.) (1848) (pocketknife); *State v. Craton,* 28 N.C. 165 (6 Ired.) (1845) (pine stub); *State v. Wiggins,* 78 N.C. App. 405, 337 S.E. 2d 198 (1985) (box cutter); *State v. Lednum,* 51 N.C. App. 387, 276 S.E. 2d 920,

*disc. rev. denied,* 303 N.C. 317, 281 S.E. 2d 656 (1981) (kitchen knife); *State v. Roper,* 39 N.C. App. 256, 249 S.E. 2d 870 (1978) ("keen bladed pocketknife"); *State v. Parker,* 7 N.C. App. 191, 171 S.E. 2d 665 (1970) (steak knife).

The distinction between a weapon which is deadly or dangerous per se and one which may or may not be deadly or dangerous depending upon the circumstances is not one that lends itself to mechanical definition.

> Nevertheless, the evidence in each case determines whether a certain kind of [weapon] is properly characterized as a lethal device as a matter of law or whether its nature and manner of use merely raises a factual issue about its potential for producing death. *See State v. Watkins,* 200 N.C. 692, 158 S.E. 393 (1931); *State v. West,* 51 N.C. 505 (1859).

*State v. Sturdivant,* 304 N.C. at 301, 283 S.E. 2d at 726 (knife).

The evidence presented in the instant case convinces us that the trial judge did not err in instructing the jury that "a utility knife is a dangerous or deadly weapon." The victim, who at the time of the assault was wearing only a one-piece bathing suit, testified that the blade of the knife was "a typical type razor blade" about one inch long. She recognized the weapon as the type of knife she had seen her stepfather use to cut carpet or sheetrock, and she "realized that it was very sharp." She described unusual physical characteristics of the knife she observed on the day of the assault and identified that knife at trial. The knife was received into evidence and was observed by the trial judge and the jury. Ms. Ashworth explained that her attacker held the knife to her throat and later used it to cut the straps off her bathing suit. Defendant's supervisor, Mr. Boone, positively identified the same knife as being the one he kept in his desk at D&S International for use by his employees, including defendant. He stated that the box cutter was used by his employees to open boxes, to uncrate machine parts, and to cut yarn away from textile beams.

We hold that this evidence amply supports the trial judge's instruction to the effect that a utility knife is a dangerous or deadly weapon per se. In the circumstances of its use by defendant here, it was "likely to produce death or great bodily harm."

*State v. Sturdivant*, 304 N.C. at 301, 283 S.E. 2d at 725. We note that the Court of Appeals reached the same conclusion in *State v. Wiggins*, 78 N.C. App. 405, 337 S.E. 2d 198 (1985), on facts even less compelling than these. Judge Whichard wrote:

> The victim testified that defendant held the cutter a couple of inches from her side as he instructed her to open the cash register. From that position a slight movement of defendant's hand in the direction of the victim's side clearly could have resulted in death or great bodily harm.

*Id.* at 407, 337 S.E. 2d at 199.

In the instant case, the defendant held the box cutter against Ms. Ashworth's unprotected neck and repeatedly threatened to kill her. A mere flick of his wrist would have allowed defendant to use the razor blade's sharp edge to cut the victim's throat. With only slightly more effort, the razor blade could have been used to slash the victim's face, bare arms, back, and legs. The dangerousness of a utility knife wielded by a man intent on raping a woman wearing only a thin bathing suit is manifest beyond question. A knife with a razor blade cutting surface which can cut through cardboard cartons, slice yarn off textile beams, and sever nylon bathing suit straps is certainly capable of cutting into exposed flesh. The trial judge did not err in instructing the jury that, as a matter of law, "a utility knife is a dangerous or deadly weapon."

In this case, therefore, the *nature* of the weapon used or displayed by defendant in the commission of his sexual assault upon the victim was not an "element"—question of fact—of the offense for which he was tried and convicted. The fourth element of first-degree rape is that the defendant "employ[ed] or display[ed] a dangerous or deadly weapon." N.C.G.S. § 14-27.2(a)(2)(a) (1981); N.C.P.I.—Crim. 207.10, at 2 (1983). The question of *fact* within this element is whether defendant *employed or displayed* the weapon found to be dangerous or deadly, here, as a matter of law. The trial judge properly instructed the jury that its duty would be to return a verdict of guilty of first-degree rape if the jury found, *inter alia*, that the State had proved, beyond a reasonable doubt, that "N.L. Torain used or displayed the utility knife."

Defendant's reliance on *Francis v. Franklin,* --- U.S. ---, 85 L.Ed. 2d 344, and other criminal "presumption" cases, although ingenious, is misplaced. No "presumption" is created when a trial judge fulfills his duty, where appropriate, as here, of declaring a weapon to be dangerous or deadly as a matter of law. Presumptions may potentially arise only as to certain "elemental" questions of fact and have no applicability to the trial court's resolution of questions of law.

Because we hold that there was no error in the challenged instruction, there can be no "plain error" as contended by the defendant.

## II.

[2] Following the close of defendant's evidence which included the testimony of defendant himself, the prosecutor moved to recall the victim, Ms. Ashworth, to testify that she recognized defendant's voice as being that of the man who attacked her on 18 June 1984. Defendant objected on grounds of surprise and requested a brief recess to research his objection. The trial judge granted a short recess, then gave the jury a two-hour extended lunch recess during which time defendant was allowed to conduct a *voir dire* examination of Ms. Ashworth. Following the *voir dire,* the trial judge indicated his inclination to allow the victim to testify after lunch but advised defense counsel, "In the meantime during the lunch if you can find some law that says it would not be appropriate, I will certainly go over it." When defendant stated after lunch that he had nothing further to bring to the court's attention, the trial judge entered findings of fact and allowed Ms. Ashworth to identify defendant's voice as the voice she heard on 18 June 1984. Defendant's timely objection was duly noted and overruled.

Ms. Ashworth had not heard defendant's voice between the date of the offense and the time he took the stand in his own behalf, although she testified that she had requested an opportunity to hear a tape recording of his voice before trial. Defendant pointed out some discrepancies in her descriptions of her attacker's voice and physical characteristics, and noted that it had been eight months since the victim had allegedly last heard defendant's voice. Ms. Ashworth remained steadfast, however, in her assertion that she recognized defendant's voice as being that

of her attacker. In his *pro se* supplemental brief, defendant first contends that the trial judge erred in permitting the State to recall Ms. Ashworth because her testimony surprised, and therefore prejudiced, him.

N.C.G.S. § 15A-1226 (1983) provides:

§ 15A-1226. *Rebuttal evidence; additional evidence.*

(a) Each party has the right to introduce rebuttal evidence concerning matters elicited in the evidence in chief of another party. The judge may permit a party to offer new evidence during rebuttal which could have been offered in the party's case in chief or during a previous rebuttal, but if new evidence is allowed, the other party must be permitted further rebuttal.

(b) The judge in his discretion may permit any party to introduce additional evidence at any time prior to verdict.

This Court has stated that if a defendant is surprised by such additional evidence, he should move for a continuance or a recess to prepare to meet the evidence. *State v. Carson*, 296 N.C. 31, 249 S.E. 2d 417 (1978); *State v. Coffey*, 255 N.C. 293, 121 S.E. 2d 736 (1961). Here, defendant requested and was allowed a recess to research his objection but was unable to locate any authority for his position, and so advised the judge.

It is within the trial judge's discretion to admit evidence on rebuttal which would have been otherwise admissible, and the appellate courts will not interfere absent a showing of gross abuse of discretion. . . .

. . . .

A trial judge has discretionary power to permit the introduction of additional evidence after a party has rested. *State v. Coffey*, 255 N.C. 293, 121 S.E. 2d 736 (1961); *State v. Perry*, 231 N.C. 467, 57 S.E. 2d 774 (1950).

*State v. Carson*, 296 N.C. at 44-45, 249 S.E. 2d at 425. *See also* N.C.G.S. § 15A-1226 (1983).

Defendant has shown no abuse of discretion. The State requested a bench conference less than fifteen minutes after the prosecutor learned that the victim wished to testify after having

heard defendant's voice as he testified on the stand. The trial judge allowed defendant's request for a recess and tendered the victim for *voir dire* examination whereupon he entered into the record extensive findings of fact. The trial judge did not err in allowing the State to recall the victim after the close of defendant's evidence.

Defendant also contends that the victim's in-court voice identification was unduly suggestive and resulted in a "very substantial likelihood of irreparable misidentification." This Court held that an in-court voice identification was not unduly suggestive in *State v. Jackson*, 284 N.C. 321, 200 S.E. 2d 626 (1973). The facts of *Jackson* are strikingly similar to those in this case. In *Jackson*, a preliminary hearing was held at which time the rape victim inadvertently overheard defendant whispering the words, "No, no" to his attorney. The victim's assailant had said to her following the rape, "No, no, don't call the police." During defendant's trial in superior court, the prosecutor inquired of the victim whether she recognized defendant's voice. The jury was excused and a *voir dire* examination was conducted wherein the victim described her assailant's voice and then testified:

> "After I heard this defendant make the statement, 'No, no,' in the District Court I jumped out of my seat just about. I mean it shocked me and I recognized it right then and I told my attorneys about it. I told the people with me that it sounded exactly like the man I had heard that night. I was talking with Detective Page about it. I told him that was it — that was him — that was him."

*State v. Jackson*, 284 N.C. at 328, 200 S.E. 2d at 630. In *Jackson*, as here, the rape victim admitted that she could not identify her assailant by sight, but immediately recognized his voice upon hearing it again for the first time in court. Unlike the instant case, however, the victim admitted in *Jackson* that, prior to her appearance in district court, she had been shown a photograph of defendant, had been told his fingerprint matched one found in her apartment, and had been informed that defendant had been arrested. Pursuant to *Stovall v. Denno*, 388 U.S. 293, 18 L.Ed. 2d 1199 (1967), this Court examined the "totality of the circumstances" surrounding the confrontation and found no due process violation.

The facts of the instant case are even more compelling. Here, the victim testified that she not only had not been given an opportunity to hear defendant's voice before trial, she also had not been requested to view a photographic display or live lineup. In addition, the *voir dire* and in-court voice identification in this case were conducted during the same proceeding in which the victim first heard and recognized her attacker's voice. The evidence in the instant case fully supports the trial judge's findings that the victim had ample opportunity to become familiar with her attacker's voice during the assault and that, although eight months had elapsed, her opportunity "to hear the voice under the unforgettable circumstances of June 18, 1984, and the freeflowing testimony of the defendant in his rambling alibi defense" rendered the time lapse of "little difference." The trial judge also found:

> The defendant was not required to talk and repeat words allegedly uttered by the assailant at the time of the crime. He voluntarily made statements he selected without suggestion from law enforcement personnel, the District Attorney, or anyone else, except his privately retained attorney.

The judge concluded that the victim's in-court voice identification was of independent origin and was "not so tainted by any State-imposed identification procedure so unnecessarily suggestive and conducive to irreparable mistaken identity as to constitute a denial of due process of law."

We hold that the trial judge's findings are amply supported by the evidence and they are, therefore, conclusive upon this Court. *See State v. Jackson*, 284 N.C. at 327, 200 S.E. 2d at 630; *State v. Taylor*, 280 N.C. 273, 279, 185 S.E. 2d 677, 681 (1972). An examination of the "totality of the circumstances" convinces us that this unplanned, completely coincidental courtroom confrontation was not violative of defendant's right to due process of law. *United States v. Davis*, 407 F. 2d 846 (4th Cir. 1969); *State v. Jackson*, 284 N.C. at 329, 200 S.E. 2d at 631; *State v. Bass*, 280 N.C. 435, 186 S.E. 2d 384 (1972). Any discrepancies or inconsistencies in the victim's identification of defendant went to the weight and not the admissibility of her testimony, and the voice identification was properly submitted to the jury. *State v. Satterfield*, 300 N.C. 621, 630, 268 S.E. 2d 510, 517 (1980). *See generally State*

*v. Brooks*, 49 N.C. App. 14, 270 S.E. 2d 592, *appeal dismissed*, 301 N.C. 723, 275 S.E. 2d 285 (1980); Annot., Identification of accused by his voice, 70 A.L.R. 2d 995 (1960).

No error.