STATE OF NORTH CAROLINA v. SHERMAN LEE YOUNG

No. 612A84

(Filed 12 August 1986)

**1. Criminal Law § 75.7— in-custody statement—failure to give Miranda warnings —absence of interrogation**

Defendant was not subjected to custodial "interrogation," and defendant's in-custody statement to an officer was not rendered inadmissible by the officer's failure to inform defendant of his *Miranda* rights, where the officer served a nontestimonial identification order on defendant at the jail; while the order was being served, defendant asked the officer why he believed the victim's story rather than his own; the officer responded that his belief was based on the evidence and the fact that defendant had lied about his whereabouts on the night in question; and defendant then stated that "I lied because I knew you wouldn't believe the truth about me falling asleep in the car while she went off with another man at the Day's Inn Motel that night." Defendant was not subjected to the functional equivalent of questioning since the officer's comment did not require or call for a response on the part of defendant and it cannot be said that the officer should have known that the statement was reasonably likely to elicit an incriminating response from defendant.

**2. Criminal Law § 75.4— invocation of right to counsel—subsequent in-custody statement—conversation not initiated by officer**

An officer did not initiate a conversation with defendant after defendant had previously invoked his right to counsel within the meaning of *Edwards v. Arizona*, 452 U.S. 973 (1981), by going to the jail and presenting defendant with a nontestimonial identification order. Nor did the officer initiate a conversation with defendant by explaining the purpose of the nontestimonial identification order in response to defendant's inquiry as to what the order was "about." Furthermore, since the officer did not interrogate defendant before defendant made an incriminating statement, admission of the statement did not violate defendant's Fifth Amendment right to have counsel present and his Sixth Amendment right to counsel.

**3. Criminal Law § 75.4— statement during service of nontestimonial identification order—no statutory right to counsel**

A statement made by defendant to an officer without the presence of counsel was not required to be suppressed under N.C.G.S. § 15A-279(d) where, at the time the statement was made, defendant was not undergoing any nontestimonial identification procedures but was merely being served with a copy of an order requiring submission to nontestimonial identification procedures.

**4. Criminal Law § 34.4— other crimes—competency to show will overcome by fear**

In a prosecution for kidnapping, rape and sexual offenses, testimony by the victim that she had hidden her jewelry in a car trunk during her confine-

State v. Young

ment there because defendant had assaulted her and taken her jewelry on a prior occasion was competent to explain the victim's unusual behavior and was probative on the issue of whether her will had been overcome in part by fears for her safety. N.C.G.S. § 8C-1, Rule 404(b).

**5. Criminal Law § 102.8— jury argument—no comment on failure to testify**

Challenged portions of the prosecutor's jury argument did not amount to an impermissible comment on defendant's failure to testify but merely referred to his failure to contradict evidence presented by the State or to produce witnesses to corroborate the truth of an alibi.

**6. Rape and Allied Offenses § 6— knife as dangerous weapon—instruction proper**

The trial court's instruction in a prosecution for first degree rape and first degree sexual offense that "a knife is a dangerous weapon" did not constitute plain error where a pocketknife was used by defendant not only to procure the submission of his victim but also to cut the clothing off her body prior to committing sexual acts, and where the knife was also used to inflict a laceration inside the victim's vagina. The fact that the victim's injuries did not require her admission to the hospital did not prohibit the pocketknife from being characterized as a dangerous or deadly weapon.

ON appeal by the defendant as of right pursuant to N.C.G.S. § 7A-27(a) from the imposition of consecutive sentences of life imprisonment upon his convictions of rape and sex offense entered by *Ross, J.*, at the 3 September 1984 Criminal Session of Superior Court, GUILFORD County. Upon jury verdicts of guilty of first-degree kidnapping, rape, and two counts of first-degree sexual offense, defendant was sentenced to concurrent sentences of life imprisonment for rape and twelve years for kidnapping and two additional life imprisonment sentences for sexual offenses to run concurrently with each other but consecutive to the life term for rape. On 29 October 1985, this Court allowed the defendant's petition to bypass the Court of Appeals on his appeal from the imposition of the sentence to a term of twelve years upon his conviction for kidnapping.

*Lacy H. Thornburg, Attorney General, by Kaye R. Webb, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Geoffrey C. Mangum, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

Defendant assigns as error the trial court's failure to suppress statements he made to a police detective, testimony by a

witness offered by the State that the defendant had assaulted and robbed her, certain statements made by the prosecutor in his argument to the jury, and the trial judge's jury instructions to the jury that a knife was a deadly weapon as a matter of law. We find no error in defendant's trial or in the sentences imposed.

The State's evidence tended to show that, in the early morning hours of Saturday, 17 March 1984, Peggy Jenkins arrived at the emergency room of the Community General Hospital in Thomasville, North Carolina. Her face was bloody, and she had numerous bruises on her body. While she was being examined by the emergency room staff, she told the nurse that she had been beaten and raped by her ex-husband, who had brought her to the emergency room. A member of the emergency room staff called the police. Detective A. W. Odum of the Guilford County Sheriff's Department arrived at the hospital at 10:13 a.m. and spoke to Ms. Jenkins. Shortly thereafter, he located the defendant in the lobby of the hospital and arrested him. The defendant was originally arrested on charges of kidnapping and rape, but was subsequently charged in four, single-count indictments with kidnapping, rape, and two charges of sexual offense.

At trial, the victim, Ms. Peggy Jenkins, testified that she was twenty-four years old; that she and the defendant had been married on 5 September 1981; and that they had divorced in January 1984, following a year's separation. Ms. Jenkins and the defendant had a three-year-old son, Derek Joshua Young.

Ms. Jenkins testified that on Friday, 16 March 1984, she drove to the defendant's place of work at Guilford Mills to obtain a child support payment from the defendant. She drove the defendant to a store to get a money order and then drove him to his home in Thomasville, leaving him at approximately 4:00 p.m. She then drove to her home in High Point, but left again later that evening and drove to a convenience store to get a drink. Ms. Jenkins testified that, as she was preparing to get out of the car, the defendant suddenly entered the passenger side, slid over beside her, and pulled out a knife, which she described as a "small pocketknife." The defendant held the knife to her throat and told her that he had some things to say to her and that she was going to listen to him. Holding the knife to Ms. Jenkins' throat, the defendant told her to drive to the mobile home of a friend, Jenni-

fer Hoots. Upon arriving at the Hoots' mobile home, the defendant tied Ms. Jenkins' hands to the steering wheel and went inside. After a couple of minutes, he came back to the car, untied Ms. Jenkins, and told her to drive to Greensboro. At this time, the defendant placed his arm around Ms. Jenkins and once more held the knife to her throat.

On the way to Greensboro, the defendant told Ms. Jenkins that he wanted her to come back to him. He also told her that he wanted custody of his son and was going to get his son, one way or the other. The defendant also argued with Ms. Jenkins concerning the fact that she was dating another man. Jenkins testified that, during this period, the defendant was extremely upset.

Ms. Jenkins testified that, upon arriving in Greensboro, the defendant demanded that they go to the Taco Bell to eat, and they did so. The defendant warned Ms. Jenkins not to try anything or he would kill her. At this time, the defendant had the knife in his pocket. Although they were inside the Taco Bell for approximately fifteen minutes, Ms. Jenkins testified that she made no attempt to escape or to alert anyone because she was afraid of the defendant. They drove to a bar and pool hall in Greensboro which the defendant frequented. Once again, the defendant threatened to kill Ms. Jenkins if she tried to get away. They stayed at the bar and pool hall about two hours. Ms. Jenkins did not attempt to escape or to alert anyone at the bar and pool hall because she felt the people at the bar were all friends of the defendant.

Ms. Jenkins and the defendant then left for Thomasville with Ms. Jenkins driving. On the way, the defendant told Ms. Jenkins that he wanted her to come back to him and that he did not want the man she had been seeing to have her. At one point, the defendant told Ms. Jenkins that if he could not have her back, he would kill her. They stopped several times on the way to High Point at the defendant's insistence. Eventually, they stopped in High Point.

Ms. Jenkins further testified that once they arrived in High Point, the defendant directed Ms. Jenkins to turn down a road off Highway 68 and pull off the road. At this point, the defendant slapped Ms. Jenkins, hit her in the chest, and told her that she was going to die and would not live to see the morning. Holding

the knife in his hand, the defendant instructed Ms. Jenkins to get out of the car. They proceeded to the rear of the car, where the defendant hit Ms. Jenkins in the face and stomach with his fist. Once again, the defendant told her that she was going to die. He then opened the trunk and told her to get in. Ms. Jenkins complied. The defendant then shut the trunk and started driving. After fifteen or twenty minutes of driving, the defendant stopped the car and opened the trunk. The defendant struck her in the face again and ordered her to remove her clothes. As she was disrobing, the defendant became impatient and used the knife to cut off Ms. Jenkins' bra and camisole and cut the front of her blue jeans open. He then removed her clothes, struck her in the face again, and forced her out of the trunk. At this point, Ms. Jenkins' nose was bleeding. The defendant continued arguing about his son and the man Ms. Jenkins was dating. The defendant told Ms. Jenkins that if she "wanted something up inside [her] so bad, he would give [her] something." At that time, the defendant inserted the blade of the pocketknife into Ms. Jenkins' vagina. She testified that this caused a "stinging, burning sensation." She identified a knife identified as State's Exhibit No. 2 as resembling the knife which the defendant had. The knife was admitted into evidence to illustrate her testimony.

Ms. Jenkins further testified that after the defendant removed the knife from her vagina, he forced her to perform fellatio on him. The defendant then pulled her up by the hair and struck her in the face and stomach. At this time, Ms. Jenkins collapsed on the ground. The defendant kicked her in the ribs, pulled her back up, and hit her in the face. He then pushed her over the trunk. He used Ms. Jenkins' shirt to tie her hands behind her back. The defendant engaged in anal and vaginal intercourse with Ms. Jenkins. During this entire period, the defendant had the knife in his hand. After engaging in vaginal intercourse with Ms. Jenkins, the defendant struck Ms. Jenkins and placed her back in the trunk. The defendant tied Ms. Jenkins' hands behind her with her pantyhose and used her shirt as a gag over her mouth. He also tied her ankles together. The defendant then closed the trunk and drove off.

Ms. Jenkins eventually managed to untie herself. She then hid her jewelry in the trunk lid. The defendant subsequently stopped the car and upon discovering that Ms. Jenkins had freed

herself from her bonds, struck her again, pulled her out of the trunk, and forced her into the front seat of the car. Seeing that Ms. Jenkins' face had stopped bleeding, the defendant said he "couldn't have that" and struck her in the face once again. The head wound reopened and blood splattered on the side windows of the car. After driving further, the defendant stopped the car and once again forced Ms. Jenkins at knifepoint to perform fellatio. Ms. Jenkins testified that the defendant continued to tell her that she was not going to live, and he stated that she had to die because he was not "going back to prison." The defendant again engaged in vaginal intercourse with Ms. Jenkins. Ms. Jenkins soon became sick and began to vomit. She asked the defendant to take her to a hospital because she was a diabetic and needed insulin. He told her that if she would lie down for awhile, she would be all right. Ms. Jenkins continued to request that the defendant take her to a hospital. She promised that she would come back to the defendant and that she would tell the hospital personnel that she had been in a fight somewhere else. Eventually, the defendant agreed to take Ms. Jenkins to his house, clean her up, and then take her to the hospital. They drove to Jennifer Hoots' mobile home, arriving in the early morning. The defendant carried Ms. Jenkins inside and cleaned her with a washcloth.

Ms. Jenkins testified that she did not say anything to Ms. Hoots because Ms. Hoots was the defendant's friend, and she did not know if she could trust her. She asked Ms. Hoots to go to the hospital with her, but Ms. Hoots refused. After spending approximately twenty minutes at the mobile home, the defendant took Ms. Jenkins to the hospital. Once inside the hospital, Ms. Jenkins told the nurses that she had been cut, beaten, and raped by the defendant. Ms. Jenkins described her injuries as swelling in her face; cuts, scrapes, and bruises on her arms, legs, and stomach; a fractured bone in her nose; a cut inside her vagina; and black eyes.

There was also testimony concerning Ms. Jenkins' condition at the hospital from an emergency room nurse and the emergency room physician. Barbara Yandle testified that she was the emergency room nurse who saw Ms. Jenkins on 17 March 1984. She stated that Ms. Jenkins told her that the defendant had forced her to engage in oral, anal, and vaginal intercourse against her will. She described Ms. Jenkins' injuries and stated that she

prepared an SBI rape kit. Dr. Jasper Jeffries testified that he was the emergency room physician who saw Ms. Jenkins. His examination revealed that she was badly bruised all over, that she had a bruised rectum consistent with some blunt object being forced in, that she had suffered rope burns on her ankles, that she had a swollen and bruised labia minora, and that there was a horizontal laceration 1.5 centimeters long on the inside of her right lower labia.

Jennifer Hoots testified that the defendant arrived at her mobile home between 6:30 and 7:00 a.m. on 17 March 1984. She stated that the defendant was carrying Ms. Jenkins. Ms. Hoots stated that Ms. Jenkins had been beaten up quite badly. The defendant told Ms. Hoots that Ms. Jenkins had been involved in a fight in a Greensboro bar. After the defendant cleaned up Ms. Jenkins, they prepared to go to the hospital. Ms. Hoots testified that Ms. Jenkins asked her to go with them, but the defendant refused to allow her to go. Ms. Hoots further testified that later that morning the defendant called her and instructed her that if anyone inquired as to where he was Friday night, she was to say that he was with her. When Ms. Hoots asked why he wanted her to say that, the defendant said, "because Peggy had called the High Point Police and the Thomasville Police." On Sunday afternoon, Ms. Hoots found a blouse, a bra, a pair of underwear, and a sock in a trash can behind her mobile home. She also discovered a knife in her bathroom. She identified the knife as belonging to Allen Berrier. The items of clothing found in the trash can were identified by Ms. Jenkins as being the clothing which she had been wearing on the night of 16 March.

Both Ms. Hoots and Frank Overman (the victim's former husband) testified that Ms. Jenkins had called them and told them that the defendant had kidnapped, assaulted, and raped her.

Detective Ronnie Whitt testified that he received the rape kit at the Thomasville hospital. He also received a pair of blue jeans from the defendant. Whitt searched Ms. Jenkins' car and found a bloodstain on the passenger window, a sock in the trunk, and some jewelry hidden in the trunk lid. He also collected hair and fabric samples from the passenger area and trunk of the car and hair samples from the defendant. These samples were sent to the SBI laboratory.

Brenda Bissette, an SBI forensic serologist, testified that although she found spermatozoa in the vaginal swabs from the rape kit, she was unable to draw any conclusions as to the donor of the semen. Bissette testified that she found human blood on the car window and on the blue jeans, socks, blouse, bra, and camisole, but could not identify the type due to the fact that the samples had not been sent to her until approximately four months after the alleged incident.

Scott Worsham, an SBI hair examiner, testified that hair found in the trunk of the car was consistent with that of Ms. Jenkins and that this hair appeared to have been forcibly removed from the scalp. He also testified that a pubic hair combed from Ms. Jenkins' pubic region was consistent with that of the defendant.

John Bendure, an SBI fiber analyst, testified that he examined the socks, blouse, camisole, and bra, as well as fiber samples from the trunk. He stated that the sock from Ms. Hoots' trash can matched the sock in the trunk and that fibers in the trunk matched fibers from Ms. Jenkins' clothing.

Detective A. W. Odum of the Guilford County Sheriff's Department testified that he questioned the defendant on the afternoon of 17 March 1984. After being advised of his constitutional rights and executing a standard waiver form, the defendant gave a statement in which he said that he and Ms. Jenkins had gone out on a date on Friday evening. After going to a bar in Greensboro, they went to Jennifer Hoots' mobile home. The defendant stated that after staying approximately thirty minutes, Ms. Jenkins left the mobile home alone. Ms. Jenkins returned at approximately 7:30 a.m. the next morning, her face covered with blood. The defendant took Ms. Jenkins to the hospital. The defendant stated that Ms. Jenkins did not tell him what had happened to her. In a continuation of the statement later that afternoon, the defendant said that he and Ms. Jenkins had been getting along well. He further stated that he and Ms. Jenkins had engaged in consensual sex the previous evening.

Detective Odum further testified that on 4 April 1984, he served a nontestimonial identification order on the defendant at the jail. Odum stated that, while serving the order, the defendant asked him why he believed Ms. Jenkins' story rather than his

own. Odum responded that his belief was based on the evidence and the fact that the defendant had lied about his whereabouts on the night in question. Odum testified that the defendant replied, "I lied because I knew you wouldn't believe the truth about me falling asleep in the car while she went off with another man at the Days Inn Motel that night."

The defendant presented evidence which tended to show that he met Ms. Jenkins at the home of Allen Berrier on the evening of 16 March 1984. Approximately twenty minutes later, the defendant and Ms. Jenkins left together. The defendant also produced a witness who testified that he saw the defendant in a Greensboro bar with a woman on the night of 16 March.

Based on this and other evidence, the jury convicted the defendant of first-degree kidnapping, first-degree rape, and two counts of first-degree sexual offense.

I.

The defendant initially contends that the trial court erred by permitting Detective Odum to testify concerning the statement made to him by the defendant on 4 April 1984. The defendant argues that this statement was obtained in violation of his fifth amendment rights as set out in *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694, *reh'g denied*, 385 U.S. 890, 17 L.Ed. 2d 121 (1966); in violation of his sixth amendment right to counsel; and in violation of N.C.G.S. § 15A-279. We conclude that the statement in question was properly admitted and therefore overrule this assignment of error.

Prior to trial, the defendant filed a motion to suppress the statement which he made to Detective Odum on 4 April 1984. The motion was heard at the 26 July 1984 Session of Superior Court, Guilford County. At the hearing, Detective Odum testified that on 4 April 1984, he served a nontestimonial identification order on the defendant at the High Point jail and was with him for about fifteen minutes. The following exchange then took place between the prosecutor and Detective Odum:

> Q. And during the course of service of that non-testimonial identification order, did you have occasion to interrogate Sherman Young in any way?

A. No, sir, I did not.

Q. Did you ask him any questions at all during the course of service of that order?

A. No, sir, I did not.

Q. Did you have any conversation with Sherman Young?

A. Yes, sir. I served the order and read it to him, the defendant, at which time he made several statements to me. It was during the attempt to get him to sign that he received service of the order, and he was very reluctant to sign because he was upset about me not believing his statement.

Q. Did he tell you that?

A. Yes, sir.

Q. And did he make any of these statements to you in response to any questions by yourself?

A. No, sir, not for that purpose.

Q. All right. Just go ahead and tell his honor, if you would, Detective Odom [sic], exactly what was said during the period of time that you were with Sherman Young.

A. As I stated, he became very upset, and asked me why he was still in jail and why did I believe her story instead of his. I told him that I believed her because of the evidence and because he lied to me about where he was that night.

He replied by stating, "I lied because I knew you wouldn't believe the truth about me falling asleep in the car while she went off with another man at the Day's Inn Motel that night."

On cross-examination, Detective Odum acknowledged that he may have told the defendant that if he (the defendant) wanted to tell the truth, he (Odum) would be willing to listen.

The defendant also testified at the suppression hearing. He stated that upon receiving the nontestimonial identification order, he asked Detective Odum what it "was all about." The defendant testified that Odum explained it to him and stated that it was either to help him (the defendant) or to aid the police in determin-

ing whether he had committed the crimes. The defendant stated that he asked Odum why he believed Jenkins rather than him. Odum stated that his belief was based on the evidence and the fact that the defendant had lied to him. The defendant stated that, at that time, Detective Odum stated that if the defendant "really wanted to — If I wanted the truth to be known," he would be willing to listen. The defendant then told Odum that he had fallen asleep in the car while Ms. Jenkins met a man at the Days Inn.

Based on this evidence, the trial court found that the following conversation occurred at the time the defendant was served with the nontestimonial identification order:

"Defendant: What's this about?

["]Detective Odom [sic]: This is to help you or to help us (the prosecution).

["]Defendant: Why did you (Detective Odom [sic]) believe her story instead of his [sic]?

["]Detective Odom [sic]: I believed her because of the evidence and because you lied to me about where you were that night.

["]Defendant: I lied because I knew you wouldn't believe the truth about me falling asleep in the car while she met another man in a car. (Detective Odom's [sic] written statement records the defendant's statement to the effect that she went off with another man at the Day's Inn Motel that night.)

["]Detective Odom [sic]: ([The following is q]uoted by defendant[,] and Detective Odom's [sic] testimony is that he might have made this statement.) If defendant want[s] to tell the truth, he (Detective Odom [sic]) would listen to him.

["]Defendant: I fell asleep in the car. She met another man in a car.["]

The trial court also found that Detective Odum did not inform the defendant of his *Miranda* rights; that no promises or threats were made to the defendant in order to induce him to make the statement; and that, although the defendant was at the time represented by counsel, he did not request the presence of counsel when

talking with Odum. The trial court then concluded as a matter of law that the defendant's statement was made "freely, voluntarily, and understandingly by him in the course of his questioning [of] Detective Odum"; that the defendant was in full understanding of his constitutional rights to remain silent and to counsel; and that he intelligently, voluntarily, and knowingly waived these rights by speaking with Detective Odum in this manner. The trial court thereupon denied the defendant's motion to suppress.

A.

[1] The defendant makes three arguments concerning the denial of his motion to suppress. First, he contends that the admission of this statement was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694. *Miranda* held that statements made by an accused in response to custodial interrogation by law enforcement officers are inadmissible against him unless he has been explicitly warned of his fifth amendment rights to remain silent and to counsel and has made a voluntary, knowing, and intelligent waiver of these rights. The defendant argues that since the trial court found that Odum failed to inform him of his *Miranda* rights again on 4 April, the statement should have been suppressed. We do not agree.

As *Miranda* and its progeny made clear, the *Miranda* protections apply only where an accused is subjected to custodial interrogation. *E.g., Minnesota v. Murphy*, 465 U.S. 420, 79 L.Ed. 2d 409, *reh'g denied*, 466 U.S. 945, 80 L.Ed. 2d 477 (1984); *Rhode Island v. Innis*, 446 U.S. 291, 64 L.Ed. 2d 297 (1980); *Orozco v. Texas*, 394 U.S. 324, 22 L.Ed. 2d 311 (1969); *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694. In this case, there is no question that the defendant was in custody at the time the statement was made. The key inquiry therefore becomes whether the defendant was "interrogated" by Detective Odum.

In *Rhode Island v. Innis*, 446 U.S. 291, 64 L.Ed. 2d 297, the Supreme Court defined the term "interrogation" for purposes of the *Miranda* decision. The Court stated that interrogation means not only express questioning by the police, but also includes any words or actions on the part of law enforcement officials which they "should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 64 L.Ed. 2d at 308 (footnotes omitted). The Court went on to say that with regard to

these other words or actions, also referred to as the "functional equivalent of questioning," the focus is on the perceptions of the suspect rather than the intent of the law enforcement officials. *Id.*

In the case *sub judice*, there was competent evidence to support the trial court's finding as to how the conversation between Detective Odum and the defendant unfolded. An examination of the conversation clearly shows that the statement was not elicited from the defendant as the result of questioning by Detective Odum. Detective Odum posed no questions to the defendant. Moreover, we do not feel that the defendant was subjected to the "functional equivalent of questioning." The defendant's statement —"I lied because I knew you wouldn't believe the truth about me falling asleep in the car while she met another man in a car"— was made in response to Detective Odum's comment that he believed Ms. Jenkins because of the evidence and the fact that the defendant had lied to him about his whereabouts on the night in question. Odum's comment did not require or call for a response on the part of the defendant. It simply cannot be said that Detective Odum should have known that this statement was reasonably likely to elicit an incriminating response from the defendant. Since the defendant was not "interrogated," Detective Odum's failure to inform the defendant of his *Miranda* rights does not render the statement in question inadmissible. The trial court's conclusion that the defendant's statement was made "freely, voluntarily, and understandingly" is supported by the findings of fact, which are in turn supported by the evidence.

B.

[2]  The defendant next argues that this statement was obtained in violation of his fifth amendment right to have counsel present at a custodial interrogation and his sixth amendment right to counsel. Specifically, he contends that Odum's actions ran afoul of the dictates of *Edwards v. Arizona*, 451 U.S. 477, 68 L.Ed. 2d 378, *reh'g denied*, 452 U.S. 973, 69 L.Ed. 2d 984 (1981). In *Edwards*, the Supreme Court held that once a suspect invokes his right to counsel, he may not be questioned further without the presence of counsel unless the defendant initiates the conversation with law enforcement authorities, at which time he may waive his right to have his attorney present. The defendant was appointed counsel on 19 March 1984. The defendant argues that since he had

invoked his right to counsel prior to 4 April, Odum's discussion with him violated his right to counsel, and the statement which he made must be suppressed. We do not agree.

Initially, we reject the defendant's argument that Detective Odum initiated the conversation by going to the jail, presenting the defendant with the nontestimonial identification order, and explaining the purpose of the order. It cannot be said that the fact that Odum went to the High Point jail and presented the defendant with the nontestimonial identification order constituted an "initiation" of conversation within the meaning of *Edwards*. The authorities were required to serve the order on the defendant. N.C.G.S. § 15A-277 states that an order to submit to nontestimonial identification procedures *must* be served at least seventy-two hours in advance of the time of compliance and may be served by a law enforcement officer. The fact that the service of the order occurs subsequent to the invocation of the right to counsel does not affect the routine nature of the service of the order nor does it constitute the initiation of conversation. *See State v. Williams*, 314 N.C. 337, 333 S.E. 2d 708 (1985) (holding that a law enforcement officer's delivery of a seizure inventory form did not constitute the initiation of conversation). Furthermore, since Detective Odum's explanation of the purpose of the nontestimonial identification order was made in response to the defendant's inquiry as to what the order was "about," it is clear that those particular comments were not an initiation of communication.

Furthermore, as noted above, the defendant was not interrogated by Detective Odum on 4 April. As the United States Supreme Court stated in *Edwards*:

> Had Edwards initiated the meeting . . . nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial. The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation. *Absent such interrogation, there would have been no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver.*

State v. Young

*Edwards v. Arizona*, 451 U.S. at 485-86, 68 L.Ed. 2d at 387 (emphasis added). Since the defendant was not subjected to custodial interrogation, his fifth amendment right to have counsel present was not violated. Similarly, since there was no interrogation, the defendant's sixth amendment right to counsel was not violated. *See Brewer v. Williams*, 430 U.S. 387, 51 L.Ed. 2d 424, *reh'g denied*, 431 U.S. 925, 53 L.Ed. 2d 240 (1977).

## C.

[3] Finally, the defendant contends that the admission of this statement violates the provisions of N.C.G.S. § 15A-279. This statute addresses the implementation of orders requiring submission for nontestimonial identification procedures. N.C.G.S. § 15A-279(d) provides:

> Any such person is entitled to have counsel present and must be advised prior to being subjected to any nontestimonial identification procedures of his right to have counsel present during any nontestimonial identification procedure and to the appointment of counsel if he cannot afford to retain counsel. No statement made during nontestimonial identification procedures by the subject of the procedures shall be admissible in any criminal proceeding against him, unless his counsel was present at the time the statement was made.

The defendant argues that since the statement was made without the presence of counsel, its suppression was mandated by this provision. In order to obtain the suppression of his statement under N.C.G.S. § 15A-279(d), a defendant must show: (1) that the statement was made during nontestimonial identification procedures, and (2) that the statement was made without the presence of counsel. "Nontestimonial identification procedures" are those procedures by which a suspect's fingerprints, palm prints, footprints, measurements, blood specimen, urine specimen, saliva sample, hair sample, handwriting exemplar, voice sample, or photographs are obtained. *See* N.C.G.S. § 15A-271. At the time the statement in question was made, the defendant was not undergoing any nontestimonial identification procedures, but was merely being served with a copy of the order requiring submission to

nontestimonial identification procedures.[1] Since the statement was not made during any nontestimonial identification procedure, its suppression was not required by N.C.G.S. § 15A-279(d).

For the above stated reasons, the trial court did not err in denying the defendant's motion to suppress the 4 April statement to Detective Odum. This assignment of error is overruled.

II.

[4] The defendant next assigns as error the trial court's admission, over objection, of the victim's testimony indicating that the defendant had assaulted her on some prior occasion. During direct examination, Ms. Jenkins testified that she had hidden her jewelry in the trunk of the car during her confinement there. The following exchange ensued:

Q. Why did you do that?

A. Because Sherman has assaulted me before—

MR. JOSEPH: Objection, Your Honor.

MR. KIMEL: We contend that would be competent and proper to show animosity or ill-will on behalf of the defendant.

THE COURT: Overruled. EXCEPTION NO. 29

Q. Go ahead. You can finish answering.

A. He had taken—he assaulted me before and taken my jewelry and—and sold it.

The defendant contends that this testimony was not admissible to show ill-will or animosity on his part, but instead constituted an attack on his character by placing before the jury evidence of prior crimes of assault and robbery. Thus, the defendant contends that the trial court's admission of this testimony was in violation of N.C.G.S. § 8C-1, Rule 404(b), which provides:

(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the

1. The defendant failed to object to either the issuance of the nontestimonial identification order or the service of the order upon him. We therefore do not address these questions.

character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

Rule 404(b) codifies the longstanding rule in this jurisdiction that evidence of other offenses is inadmissible on the issue of guilt if its *only* relevancy is to show the character of the accused or his disposition to commit an offense of the nature of the one charged; but if it tends to prove any other relevant fact,[2] it will not be excluded merely because it also shows him to have been guilty of an independent crime. 1 Brandis on North Carolina Evidence § 91 (1982). The defendant's general objection to the victim's response is ineffective unless there is no proper purpose for which the evidence is admissible. *State v. McKoy*, 317 N.C. 519, 347 S.E. 2d 374 (1986). The burden is on the defendant to show that there was no proper purpose for which the evidence could be admitted. *Id.*

The defendant contends that "animosity or ill-will" had no relevancy to any issue in this case since he was not on trial for felonious assault or murder. We cannot agree that animosity and ill-will are states of mind limited to murderers or perpetrators of felonious assaults, or are relevant only to those offenses. The State's evidence tended to show that the defendant was angry and frustrated with the victim as a result of custody disputes in the past involving their young son and that the defendant was resentful of the victim's dating another man to whom the defendant repeatedly referred during the night in question.

More importantly, the question posed by the prosecutor which prompted the victim's objected-to response was, "Why did you do that [hide the jewelry]?" It appears that the purpose of the question, at least originally, was to have Ms. Jenkins explain her own unusual behavior in defense of her property — hiding her jewelry in the trunk of the car — in order to demonstrate to the jury that she did indeed have reason to fear the defendant.

---

2. We have noted that the second sentence of Rule 404(b) contains a list of theories of relevancy which is neither exclusive nor exhaustive. *State v. Morgan*, 315 N.C. 626, 637, n. 2, 340 S.E. 2d 84, 91, n. 2 (1986).

The defendant had told Detective Odum that he and the victim had engaged in consensual sexual relations on the night in question, and defendant's witnesses at trial testified that Ms. Jenkins and the defendant had gone out on a date that evening. The victim's testimony was to the effect that she consented neither to accompany the defendant around Guilford County nor to have sexual relations with him.

Ms. Jenkins had earlier testified that prior to entering the Taco Bell that evening, the defendant "told me not to try anything and not to act stupid because he would kill me right there if I did." She explained that the reason she did not attempt to alert anyone of her peril once inside the restaurant was "[b]ecause with past experience with Sherman, I was scared of him and I was afraid that he would do it." In addition, Ms. Jenkins later testified without objection that when the defendant had discovered that she had thrown her clothes out of the trunk, the defendant said, " 'Okay. . . . Let's have it,' and I asked him what. And he said, 'The rocks.' He was talking about my jewelry. I told him I had thrown them out too, because he wasn't going to get them this time."

We have held that evidence of a victim's awareness of prior crimes allegedly committed by the defendant may be admitted to show that the victim's will had been overcome by her fears for her safety where the offense in question requires proof of lack of consent or that the offense was committed against the will of the victim. *See, e.g., State v. See,* 301 N.C. 388, 392, 271 S.E. 2d 282, 285 (1980); *State v. Taylor,* 301 N.C. 164, 172-73, 270 S.E. 2d 409, 415 (1980). Each of the offenses for which the defendant was on trial and for which he was convicted requires proof beyond a reasonable doubt that the offenses were committed against the will of the victim or without her consent. N.C.G.S. §§ 14-27.2(a)(2) (first-degree rape), 14-27.4(a)(2) (first-degree sexual offense), 14-39 (first-degree kidnapping) (1981 and Cum. Supp. 1985).

In this context, we cannot agree that the *only* relevance of the brief reference to a prior assault was to show a disposition to commit offenses similar to those for which the defendant was on trial. The challenged testimony was competent to explain Ms. Jenkins' unusual defensive behavior and was probative on the issue of whether her will had been overcome in part by her fears for

her safety. The defendant has failed to carry his burden of showing that there was no proper purpose for which this testimony was admissible and has failed to convince us that its prejudicial effect substantially outweighed its probative value. N.C.G.S. § 8C-1, Rule 403 (Cum. Supp. 1985). This assignment of error is overruled.

III.

[5]   Defendant next assigns as error the trial court's failure to intervene *ex mero motu* during the prosecutor's final argument to the jury when the prosecutor allegedly made improper references to the defendant's failure to testify. The prosecutor had argued that neither of the defendant's statements to Detective Odum were believable, and he then stated, "More about his story, or lack of a story, later." True to his word, the prosecutor later argued to the jury:

Did anybody, Mr.—Mr. Young never put on anybody from the Days Inn Motel and says that Miss Young [Jenkins] was there, checked in, had a room receipt, got a key. Anybody check in with a party of two that night? It didn't happen.

In his brief on appeal, the defendant has provided an accurate statement of the applicable rules of law:

While a prosecutor is permitted, consistent with a defendant's right not to testify, to comment on the failure of a defendant to produce witnesses to corroborate the truth of an alibi, *e.g., State v. Jordan*, 305 N.C. 274, 287 S.E. 2d 827 (1982); *State v. Thompson*, 293 N.C. 713, 239 S.E. 2d 465 (1977), or even to comment on a defendant's failure to produce evidence to rebut or contradict the State's case, *e.g., State v. Foust*, 311 N.C. 351, 317 S.E. 2d 385 (1984); *State v. Tilley*, 292 N.C. 132, 232 S.E. 2d 433 (1977); *State v. Smith*, 290 N.C. 148, 226 S.E. 2d 10 (1976); *State v. Farrow*, 66 N.C. App. 147, 310 S.E. 2d 418 (1984), the prosecutor commits error of constitutional dimension by remarking directly on the defendant's failure to testify, *e.g., State v. Monk*, 286 N.C. 509, 212 S.E. 2d 125 (1975).

The defendant's exceptions of record and assignments of error identify no portion of the prosecutor's argument in which he

remarked "directly on the defendant's failure to testify." The statements complained of by the defendant amount merely to the prosecutor's comment on the defendant's failure to produce witnesses to corroborate the truth of a pretrial alibi.

As we stated in *State v. Jordan*, 305 N.C. 274, 287 S.E. 2d 827 (1982):

> Although the defendant's failure to take the stand and deny the charges may not be the subject of comment, the defendant's failure to produce exculpatory evidence or to contradict evidence presented by the State may properly be brought to the jury's attention by the State in its closing argument. *State v. Tilley*, 292 N.C. 132, 232 S.E. 2d 433 (1977); *see State v. Bryant*, 236 N.C. 745, 73 S.E. 2d 791 (1953). The prosecutor's remark here was directed solely toward the defendant's failure to offer evidence to rebut the State's case, not at defendant's failure to take the stand himself; as such, the statement did not constitute an impermissible comment on defendant's failure to testify. *State v. Stanfield*, 292 N.C. 357, 233 S.E. 2d 574 (1977); *State v. Tilley*, 292 N.C. 132, 232 S.E. 2d 433.

*Id.* at 280, 287 S.E. 2d at 831.

Defendant made no objection to the prosecutor's argument at trial. Ordinarily, objection to the prosecutor's jury argument must be made prior to the verdict in order for the alleged impropriety to be reversible on appeal. *State v. Jones*, 317 N.C. 487, 346 S.E. 2d 657 (1986); *State v. Brock*, 305 N.C. 532, 290 S.E. 2d 566 (1982). Failure to lodge an objection constitutes a waiver of the alleged error. *State v. Brock*, 305 N.C. 532, 290 S.E. 2d 566. We have held today in *State v. Jones*, however, that even in non-capital cases, appellate review may be had of a prosecutor's argument for *gross* impropriety in the absence of an objection at trial. Our review of the prosecutor's argument in this case convinces us that the challenged portions did not amount to an impermissible comment on the defendant's failure to testify, but merely referred to his failure to contradict evidence presented by the State or to produce witnesses to corroborate the truth of an alibi. As such, the trial judge did not err in failing to intervene *ex mero motu*.

### IV.

[6]  By his next assignment of error, the defendant contends that the trial court's instruction that "a knife is a dangerous or deadly weapon" constituted "plain error" because the instruction incorrectly stated the law, created an irrebuttable mandatory presumption violating due process, and was an improper judicial comment on a question of fact for the jury.

Ms. Jenkins testified that throughout the all-night ordeal to which he subjected her, the defendant made use of a "small pocketknife" which he held at her neck, used to cut her undergarments off her body and to cut the front of her jeans, and inserted into her vagina causing a laceration. The State introduced a knife found by Ms. Hoots on her vanity which was identified by the victim as similar to the one which the defendant continuously had in his possession during the night in question, and the knife was received for illustrative purposes at trial and exhibited to the jurors. Hoots discovered the knife subsequent to the defendant's presence at her mobile home. There was testimony that the knife belonged to Allen Berrier, that it was ordinarily kept at Berrier's home, and that the defendant had ready access to the knife. In his instruction to the jury on the offenses of first-degree rape and first-degree sexual offense, the trial judge charged the jury that in order to convict the defendant of these offenses, it must find beyond a reasonable doubt that the defendant "employed or displayed a dangerous or deadly weapon," and he instructed that "a knife is a dangerous or deadly weapon." The defendant did not object at trial to any of the trial court's jury instructions regarding the knife. Therefore, the defendant has waived his right to assign this instruction as error on appeal unless he can show that the instruction was "plain error" as that term has been defined by this Court. *State v. Torain*, 316 N.C. 111, 116, 340 S.E. 2d 465, 468 (1986).

Defendant filed his brief in this case prior to our filing of the opinion in *Torain*, in which we considered the arguments advanced here by the defendant and concluded that the trial court's instruction in *Torain* that "a utility knife is a dangerous or deadly weapon" was not error. There we reiterated the rule that "[w]here the alleged deadly weapon and the manner of its use are of such character as to admit of but one conclusion, the question

as to whether or not it is deadly . . . is one of law, and the Court must take the responsibility of so declaring." *Id.* at 119, 340 S.E. 2d at 470; *State v. Smith*, 187 N.C. 469, 470, 121 S.E. 737, 737 (1924); *State v. West*, 51 N.C. 505 (6 Jones 1859). A pocketknife has been recognized in this state as a deadly or dangerous instrumentality as a matter of law. *See State v. Collins*, 30 N.C. 407 (8 Ired. 1848); *State v. McKinnon*, 54 N.C. App. 475, 283 S.E. 2d 555 (1981).

In the instant case, as in *Torain*, the weapon was used by the defendant not only to procure the submission of his victim, but also to cut the clothing off her body prior to committing sexual acts. Unlike *Torain*, however, in the present case, the defendant apparently used the knife directly to inflict an injury on his victim; here, the evidence is uncontroverted that a small laceration was found inside the victim's vagina, tending to corroborate her testimony that the defendant had inserted the pocketknife into her vagina. The defendant's argument that the victim's injuries did not require her admission to the hospital misses the point. In order to be characterized as a "dangerous or deadly weapon," an instrumentality need not have actually inflicted serious injury. A dangerous or deadly weapon is "any article, instrument or substance which is *likely* to produce death *or* great bodily injury." *State v. Sturdivant*, 304 N.C. 293, 301, 283 S.E. 2d 719, 725 (1981) (emphasis added). This assignment of error is overruled.

The defendant received a fair trial, free from prejudicial error.

No error.