STATE OF NORTH CAROLINA v. PATSY E. COPLEN, Defendant

No. COA99-523

(Filed 16 May 2000)

**1. Evidence— gunshot residue test—obtained without non-testimonial identification order—probable cause and exigent circumstances—right to counsel**

The trial court did not err in a noncapital first-degree murder prosecution (second-degree murder conviction) by denying defendant's motion to suppress a gunshot residue test conducted without a nontestimonial identification order, even though the test lies within the purview of N.C.G.S. § 15A-271. Gunshot residue evidence may be properly admitted if it was obtained by some other lawful procedure; here, there were findings of fact to support the conclusion of probable cause and exigent circum-

**STATE v. COPLEN**

[138 N.C. App. 48 (2000)]

stances. Although defendant contended that her right to counsel was violated, there is no constitutional right to counsel during a gunshot residue test. Defendant had statutory protection from the use of statements made during a nontestimonial identification procedure when counsel was not present, but she only sought to suppress the results of the test and not the statements.

**2. Homicide— premeditation and deliberation—sufficiency of evidence—conviction of second-degree murder**

Any error was not prejudicial in a first-degree murder prosecution where the court denied defendant's motion to dismiss based upon insufficient evidence of premeditation and deliberation. There was substantial evidence that the killing was premeditated and deliberated and the jury returned a verdict of second-degree murder, which does not require premeditation and deliberation.

Appeal by defendant from judgment entered 19 October 1998 by Judge Ronald L. Stephens in Superior Court, Brunswick County. Heard in the Court of Appeals 22 February 2000.

*Attorney General Michael F. Easley, by Assistant Attorney General Tina A. Krasner, for the State.*

*Mary March Exum for defendant-appellant.*

TIMMONS-GOODSON, Judge.

Patsy E. Coplen ("defendant") and Richard Martin ("the victim") lived together in a mobile home in the Oscar Long Subdivision of Leland, North Carolina. On 6 May 1996 at approximately 10:30 or 11:00 p.m., Betty Harper ("Harper"), a neighbor, heard defendant call for help. Defendant informed Harper that she had gone to the store to buy beer for her husband and that when she returned home, she found his body lying in a pool of blood.

Harper owned a .38 caliber Tahitian Tiger revolver which she had loaned to defendant approximately six months before the victim was shot. Harper asked defendant to return the weapon, but defendant had not returned the weapon prior to the date of the shooting. Defendant had worked as a law enforcement officer. In her duties as a police officer, defendant carried a .357 caliber Magnum revolver. Harper's .38 caliber revolver and defendant's .357 caliber revolver were found at defendant's residence.

Another neighbor, Norman Roberts ("Roberts") heard banging noises between 10:30 p.m. and 11:00 p.m. on 6 May 1996. Approximately ten minutes after he heard the noises, Roberts saw defendant's car entering the trailer park and headlights shone in his window. Roberts heard defendant screaming as she exited her home, "Oh my God; Richard's been shot." Roberts entered defendant's trailer and saw the victim in the bedroom. He noted that the bedroom window was shattered and glass covered the bed, but the window screen was still in place.

Terry Shambley ("Shambley"), who lived across the street from defendant heard a banging noise at approximately 11:00 p.m. when she was outside walking. Shambley did not see defendant's car at the time. Approximately ten to fifteen minutes after she heard the noise, Shambley saw defendant drive into defendant's driveway.

According to the owner of the Leland Grocery Store, defendant entered the store between 11:00 p.m. and 11:30 p.m. and bought a six-pack of beer. The grocery store is located approximately seven miles from defendant's residence.

Dr. Charles Garrett ("Dr. Garrett") of the Chief Medical Examiner's Office for the State of North Carolina performed an autopsy on the victim. The autopsy revealed that the victim had suffered gunshot wounds to the right arm, right leg, and to the head and that the victim had died from the gunshot wound to the head.

Special Agent Mike Garrett ("Garrett") with the State Bureau of Investigations ("SBI") conducted a crime scene search at defendant's residence. Garrett recovered .38 caliber revolver ammunition from the master bedroom of the mobile home. Additionally, Garrett discovered law enforcement paraphernalia, including handcuffs, a badge and a night stick holder. He also recovered cartridges from a gray Honda that was parked in front of the mobile home. There were no signs of forced entry or theft. A bag containing a six-pack of beer was located on the kitchen counter and the beers were cool to the touch.

Special Agent Eugene Bishop ("Bishop") of the SBI observed that the bullet fragments taken from the victim's body were consistent in design with the bullets taken from defendant's bedroom and from the Honda automobile. Bishop testified that both a .38 caliber weapon and a .357 caliber weapon could have fired all of the ammunition that was discovered in defendant's home and in the car, but that the bullet

fragments taken from the victim's leg could not have been fired from the .357 revolver.

Tom Hunter, a detective with the Brunswick County Sheriff's Department, arrived at defendant's residence at 12:42 a.m. on 7 May 1996. He informed defendant that he was going to take her to the hospital to see her husband. Defendant replied, "Okay." As defendant walked to the car, she stated to a neighbor, "I guess I am going to jail." Defendant entered the car. She was not handcuffed, nor was she told she was under arrest.

In the waiting room at the hospital, Detective Hunter informed defendant he was "going to have to do a gunshot residue kit on her hands." Defendant initially refused, stating, "No, no. Don't I have the right to counsel?" A few minutes later, defendant submitted to the hand wiping.

Special Agent Charles McClelland, Jr. of the SBI tested the gunshot residue kit that had been taken from defendant and discovered gunshot residue particles in samples taken from defendant's left palm.

At 6:30 a.m. on 7 May 1996, defendant called Harper and asked why Harper had informed law enforcement officers that defendant was in possession of Harper's revolver. Harper responded that she did not want either of them to get in trouble. Defendant informed Harper that she "had opened up a fine goddamned can of worms there," and hung up.

On the morning of 7 May 1996, defendant also called Robby Robbins ("Robbins"), and requested that he meet her at McDonald's. At the restaurant, defendant informed Robbins that her husband had been shot the night before and that she thought she was a suspect in the crime. On 8 May 1996, she again requested to meet with Robbins. She informed him that she had done something which would make him angry: she had told the sheriff's department that the two of them had been target shooting. Robbins had never been target shooting with defendant.

Defendant was indicted on 20 May 1996 for murder. Prior to trial, on 11 July 1997, defendant filed a motion to suppress the gunshot residue test. After considering all of the evidence and arguments of counsel, the trial court denied defendant's motion. Defendant was tried noncapitally for first degree murder. Following a jury verdict of guilty of second degree murder, the trial court imposed an active sen-

tence of a minimum of 120 months with the corresponding maximum of 153 months. Defendant appeals.

---

On appeal, defendant argues that the trial court erred in: (I) denying her motion to suppress the gunshot residue test; and (II) denying her motion to dismiss the case at the close of the evidence.

## I. Motion to Suppress

[1] By her first assignment of error, defendant argues that the trial court erred by denying her motion to suppress the gunshot residue test administered by Detective Hunter. Specifically, defendant argues that the trial court erred in concluding that North Carolina General Statutes section 15A-271 does not apply to gunshot residue evidence. While we agree with defendant that gunshot residue evidence is nontestimonial identification for purposes of section 15A-271, we believe the trial court properly denied defendant's motion to suppress the evidence.

Appellate review of a denial of a motion to suppress is limited to a determination of whether competent evidence supported the trial court's findings of fact and whether the findings of fact supported the trial court's conclusions of law. *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). In the present case, defendant does not object to the findings of fact which the trial court made in the order denying defendant's motion to suppress. Defendant merely assigns error to the denial of the motion to suppress. Therefore, the issues before this Court are whether the trial court's findings of fact support its conclusions of law and whether its conclusions of law are legally correct.

The trial court made the following pertinent conclusions of law in the order denying defendant's motion to suppress the gunshot residue evidence:

1. N.C.G.S. 15A-271 et. seq. does not apply to gunshot residue evidence in that gunshot residue is evidence found on a person's body and not evidence of a person's body such as hair or saliva.

2. If 15A-271 does apply to this type [sic] evidence, it is not the exclusive means by which this type of evidence may be collected by law enforcement officers.

. . . .

7. Under the totality of the circumstances, probable cause and exigent circumstances existed at the time the evidence in this case was seized.

Defendant argues that North Carolina General Statute section 15A-271 *et. seq.* applies to gunshot residue evidence because such evidence is "nontestimonial identification." N.C. Gen. Stat. § 15A-271 (1999). As such, defendant contends that she was entitled to the benefit of the procedures outlined in section 15A-271 *et. seq.*, including the presence of counsel. According to that provision:

> A nontestimonial identification order authorized by this Article may be issued by any judge upon request of a prosecutor. As used in this Article, "nontestimonial identification" means identification by fingerprints, palm prints, footprints, measurements, blood specimens, urine specimens, saliva samples, hair samples, or other reasonable physical examination, handwriting exemplars, voice samples, photographs, and lineups or similar identification procedures requiring the presence of a suspect.

N.C.G.S. § 15A-271.

Article 14, in which North Carolina General Statutes section 15A-271, *et. seq.* appears, was enacted in order to "provide the State with a valuable new investigative tool to compel the presence of unwilling suspects for nontestimonial identification procedures, even though insufficient probable cause existed to permit their arrest." *State v. Watson*, 294 N.C. 159, 164, 240 S.E.2d 440, 444 (1978) (emphasis omitted). In other words, Article 14 serves as a supplement to existing investigative procedures for use in cases where a lawful arrest is not yet warranted. *State v. McDonald*, 32 N.C. App. 457, 232 S.E.2d 467, *disc. review denied*, 292 N.C. 469, 233 S.E.2d 925 (1977).

Clearly, section 15A-271 does not set out exclusive procedures for obtaining nontestimonial identification. *State v. McCain*, 39 N.C. App. 213, 217, 249 S.E.2d 812, 815 (1978). "Nothing in [Article 14] shall preclude such additional investigative procedures as are otherwise permitted by law." N.C. Gen. Stat. § 15A-272 (1999). Therefore, the trial court properly concluded that "[i]f 15A-271 does apply to this type [sic] evidence, it is not the exclusive means by which this type of evidence may be collected by law enforcement officers."

In *State v. Odom*, 303 N.C. 163, 277 S.E.2d 352 (1981), our Supreme Court indicated that a gunshot residue test is a nontestimo-

nial identification procedure governed by section 15A-271 *et. seq.* "[D]efendant did have a statutory right to have counsel present during the [gunshot residue test] by virtue of G.S. 15A-279(d) (1978)." *Id.* at 168, 277 S.E.2d at 356, n.3. While the above determination was not central to the holding in *Odom,* we agree that a gunshot residue test falls within the purview of section 15A-271 based on our analysis of the statutory language.

Like the other procedures described in section 15A-271, a gunshot residue test is a relatively non-intrusive procedure which requires the presence of the suspect. A gunshot residue test may logically be considered "other reasonable physical examination" in a class with identification by fingerprints, blood specimens, urine specimens, saliva and hair samples. N.C.G.S. § 15A-271. Similarly, a residue test falls within the broad language "similar identification procedures" in that it is comparable to handwriting exemplars, voice samples, photographs, and lineups. *Id.*

We hold that section 15A-271 *et. seq.* applies to gunshot residue evidence and the trial court erred in concluding otherwise. However, as indicated above, the gunshot residue evidence was properly admitted into evidence if it was obtained by some lawful procedure other than the one described in section 15A-271 *et. seq.*

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures and establishes, as a general rule, that a valid search warrant must accompany every search or seizure. *State v. Allen,* 282 N.C. 503, 194 S.E.2d 9 (1973). However, an exception arises when law enforcement officers have probable cause to search and "the circumstances of a particular case render impracticable a delay to obtain a warrant." *State v. Allison,* 298 N.C. 135, 141, 257 S.E.2d 417, 421 (1979). "If probable cause to search exists and the exigencies of the situation make a warrantless search necessary, it is lawful to conduct a warrantless search." *State v. Smith,* 118 N.C. App. 106, 111, 454 S.E.2d 680, 684, *rev'd on other grounds,* 342 N.C. 407, 464 S.E.2d 45 (1995).

"Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonable trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *State v. Zuniga,* 312 N.C. 251, 261, 322 S.E.2d 140, 146 (1984) (quoting *Brinegar v. United States,* 338 U.S. 160, 175-76, 93 L. Ed. 1879, 1890 (1949)).

In the present case, the trial court made the following findings of fact in support of its conclusion that probable cause and exigent circumstances existed at the time the evidence in this case was seized:

3. Detective Tom Hunter had previously known the defendant as early as 1993 when the defendant interviewed with Det. Hunter for a job at the Sandy Creek Police Department.

4. Detective Hunter was familiar with the defendant's normal tone of voice and normal disposition.

5. Detective Hunter knew that the defendant and the victim had a stormy marriage and had responded in a back up capacity to the marital home to answer a domestic call on a prior date.

6. Detective Hunter arrived at the crime scene or marital home at approximately 12:42 a.m. on the morning of May 7, 1997 [sic]. The marital home or crime scene is a double wide mobile home located off of Mt. Misery Road in Leland.

7. Det. Hunter spoke with officers Wilson, Huntsman, and Mason of the Brunswick County Sheriff's Department. These officers stated to Det. Hunter that there was a shooting inside the residence.

8. At the crime scene, Det. Hunter and other officers were able to determine that:

a. There were no signs of forced entry into the home;

b. There were no signs that the home had been ransacked;

c. There were no signs of larceny from the home in that there were valuable appliances and jewelry inside of the home;

d. There were signs of a dispute or struggle inside the bedroom where the victim was located in that there was a window that appeared to have been broken from the inside;

e. There was a bag of beer in the kitchen and cold beer in the refrigerator[.]

. . . .

9. At the crime scene, Det. Hunter and other officers were able to learn, either by direct [sic] observation or from reliable hearsay that:

a. The defendant had reportedly found her husband and told neighbors that he had been shot;

b. The defendant and victim had had an argument earlier in the day;

c. The defendant had a 5 shot revolver that had been loaned to her by a neighbor;

d. No one other than the defendant and victim were home the evening of the shooting;

e. The defendant stated that her husband was alive when she left the home to get him some beer and she found him in a pool of blood when she returned home.

10. Prior to leaving the crime scene with Det. Hunter, the victim was asked by a neighbor where she was going. The defendant responded, "To jail, I guess". [sic] At the time, the defendant was actually going to the hospital with Det. Hunter to check on the condition of the victim.

11. During the ride in Det. Hunter's car, the defendant made several statements that were recorded by Det. Hunter's tape recorder.

12. One of the recorded statements was inconsistent with earlier statements attributed to the defendant about her husband having been shot. This statement is considered as having some weight by the court.

13. The taped conversation indicates that at no time did the defendant express any concern about her husband's condition.

14. The tape indicates that the defendant volunteered information concerning other suspects.

15. The tape indicates that the defendant never appeared to be hysterical nor did her normal voice ever change.

16. Chuck McClelland, a special agent of the State Bureau of Investigation, was tendered and accepted by the court as an expert in the area of forensic chemistry.

17. Agent McClelland testified that gunshot residue wipings must be taken within a four hour time frame, measured from the time of shooting, in order to have any evidentiary value when dealing with a live subject engaging in normal activities.

18. Agent McClelland testified, and this court finds, that the taking of the wipings outside the four hour window in this case would have had no evidentiary value.

19. Agent McClelland testified, and this court finds, that gunshot residue may be easily removed or destroyed through normal activities such as wringing hands, putting hands in pockets, or shaking hands. The court also finds that gunshot residue evidence may be easily destroyed by a person wishing to destroy evidence by such action as hand washing. Gunshot residue evidence is more evanescent than the types of evidence mentioned under 15A-271.

20. Court finds that rural Brunswick County requires law enforcement officers to travel great distances during the course of their duties.

21. The court finds that it would have been a practical impossibility for Det. Hunter to secure a non-testimonial identification order under the procedures set forth under 15A-271 et seq. due to the geographical limitations of Brunswick County and the evanescent nature of the gunshot residue evidence.

Believing that the above findings of fact adequately support the conclusion that probable cause and exigent circumstances existed at the time of the gunshot residue test, we hold that the warrantless search was valid.

Defendant further argues that her right to counsel was violated by the administering of the gunshot residue kit. Under the constitution, there is no right to have counsel present during a gunshot residue test. *Odom*, 303 N.C. at 167, 277 S.E.2d at 355. "[W]e hold that the administration of a gunshot residue test is not a critical stage of the criminal proceedings to which the constitutional right to counsel attaches . . . ." *Id.* However, defendant argues that she enjoyed a statutory right to have counsel present. According to section 15A-279(d):

Any such person is entitled to have counsel present and must be advised prior to being subjected to any nontestimonial identification procedures of his right to have counsel present during any nontestimonial identification procedure and to the appointment of counsel if he cannot afford to retain counsel. No statement made during nontestimonial identification procedures by

the subject of the procedures shall be admissible in any criminal proceeding against him, unless his counsel was present at the time the statement was made.

N.C.G.S. § 15A-279(d). Section 15A-279(d) "addresses the implementation of orders requiring submission for nontestimonial identification procedures." *State v. Young*, 317 N.C. 396, 410, 346 S.E.2d 626, 634 (1986).

In the present case, we have already determined that no order was required in that probable cause and exigent circumstances existed which justified the search. In any event, according to the plain language of section 15A-279(d), the provision protects the defendant from having statements made during the nontestimonial identification procedure used against her at trial where counsel was not present during the procedure. *See, e.g., id.* In the instant case, defendant did not seek to suppress statements made during the procedure but instead sought to suppress the results of the test. We conclude that section 15A-279(d) does not afford defendant any relief on the counsel issue.

The trial court's error in concluding that "15A-271 *et. seq.* does not apply to gunshot residue evidence" is rendered harmless by its second conclusion of law: "If 15A-271 does apply to this type [sic] evidence, it is not the exclusive means by which this type of evidence may be collected by law enforcement officers." We hold that the trial court did not err in denying defendant's motion to suppress the results of the gunshot residue test.

## II. Motion to Dismiss

[2] By her second assignment of error, defendant argues that the trial court erred in denying her motion to dismiss the case at the close of the evidence because the evidence was insufficient to support a conviction for first degree murder. Defendant contends that the State failed to present substantial evidence that the murder was premeditated and deliberated. We cannot agree.

When a defendant makes a motion to dismiss based on the insufficiency of the evidence, the trial court must determine whether the State presented substantial evidence of each essential element of the offense and that the defendant was the perpetrator of the offense. *State v. Vause*, 328 N.C. 231, 236, 400 S.E.2d 57, 61 (1991). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting

*State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980)). The evidence must be considered in the light most favorable to the State. *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980).

First degree murder is the unlawful killing of a human being with malice, premeditation, and deliberation. *State v. Skipper*, 337 N.C. 1, 26, 446 S.E.2d 252, 265 (1994). "Premeditation means that the act was thought out beforehand for some length of time, however short, but no particular amount of time is necessary for the mental process of premeditation." *State v. Conner*, 335 N.C. 618, 635, 440 S.E.2d 826, 835-36 (1994). "Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *Id.* at 635, 440 S.E.2d at 836. Premeditation and deliberation usually must be proved by circumstantial evidence. *State v. Small*, 328 N.C. 175, 181, 400 S.E.2d 413, 416 (1991). Circumstances to consider in determining whether a killing was premeditated and deliberate include: the conduct and statements of the defendant before and after the killing, ill-will or previous difficulty between the parties, and evidence that the killing was done in a brutal manner. *Id.* at 181-82, 400 S.E.2d at 416.

In the instant case, the State presented the following evidence that the killing was premeditated and deliberate. Defendant and the victim had a stormy relationship and had argued on the day of the killing. Betty Harper had loaned defendant a revolver over six months before the killing and defendant failed to return the weapon. The victim suffered gunshot wounds to the arm, leg, and head. Following the killing, defendant spoke in a normal tone of voice and never inquired about the condition of the victim. Although Detective Hunter informed defendant that he was going to take her to the hospital to see her husband, defendant stated to a neighbor, "I guess I am going to jail." On the day after the killing, defendant called Betty Harper at 6:30 a.m., asked why Harper had told law enforcement officers about the revolver, and informed Harper that she had "opened a fine goddamned can of worms there." Defendant requested that Robby Robbins meet with her and informed Robbins that she had told the sheriff's department that the two of them had been target shooting when in reality they had never been target shooting together. We conclude that the case was properly submitted to the jury in that there was substantial evidence that the killing was premeditated and deliberate.

Furthermore, while the offense of first degree murder was submitted to the jury, the jury returned a verdict of guilty of second degree murder. Second degree murder does not require premeditation and deliberation. Therefore, even if there was not substantial evidence of premeditation and deliberation, defendant could not have been prejudiced by the submission of the issue to the jury.

For the reasons stated herein, we find that defendant received a trial, free from prejudicial error.

No error.

Judges GREENE and WALKER concur.