An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-563

NORTH CAROLINA COURT OF APPEALS

Filed: 15 April 2014

STATE OF NORTH CAROLINA

v.

Mecklenburg County
Nos. 11 CRS 233836-37

MONTREALL LAVELL BANNER
    Defendant.


Appeal by defendant from judgment entered 9 November 2012 by Judge Yvonne Mims Evans in Mecklenburg County Superior Court. Heard in the Court of Appeals 10 October 2013.

> *Roy Cooper, Attorney General, by Francis W. Crawley, Special Deputy Attorney General, and Jennie Wilhelm Hauser, Special Deputy Attorney General, for the State.*
>
> *Glenn Gerding for defendant-appellant.*


DAVIS, Judge.


Defendant Montreall Lavell Banner ("Defendant") appeals from his convictions for first-degree murder and attempted robbery with a dangerous weapon. His primary contentions on appeal are that (1) the trial court erred in failing to instruct the jury concerning the defense of withdrawal; and (2) his trial counsel's failure to request a withdrawal instruction

constituted ineffective assistance of counsel. After careful review, we conclude that Defendant received a fair trial free from error.

## Factual Background

The State's evidence at trial tended to establish the following facts: On 23 July 2011, Ms. Shenelle Boetius ("Boetius"), Mr. Jeremy Jackman ("Jackman"), Ms. Shanika Franklin ("Franklin"), and Mr. Deone Varra ("Varra") decided to rob Isaac Rodriguez ("Rodriguez") at his room at the Brookwood Inn ("the Inn"). Varra called Defendant and told Defendant to meet him at the Inn. Once at the Inn, Defendant met up with Varra, Boetius, Jackman, and Franklin outside Varra's room, where Varra asked Defendant to participate in the robbery.

The group ultimately decided upon a plan in which Boetius and Franklin would knock on Rodriguez's door, gain entry, and distract Rodriguez while Defendant, Jackman, and Varra listened in on what transpired in the room by way of a cell phone set on speakerphone and hidden on Boetius's person. When they determined that Rodriguez was distracted, Defendant and Jackman would then enter the room and hold Rodriguez at gunpoint so that they could "do the robbery." Both Defendant and Jackman were armed with firearms.

Shortly after knocking on Rodriguez's door and being invited in by Rodriguez, Boetius and Franklin changed their

minds about participating in the robbery. After turning off the concealed cell phone, they informed Rodriguez that he was about to be robbed. Franklin then left the motel room and Boetius began to follow her. While Boetius was still in the doorway, Defendant and Jackman came down the hallway and pushed past her into Rodriguez's room. Boetius then "took off running." As she was running away, Boetius heard a single gunshot.

Shortly thereafter, Jackman called Boetius on her cellphone and told her to meet him in the back of the Inn parking lot. Boetius complied and went to the back of the lot where she met up with Defendant and Jackman. She observed Jackman had wrapped up his gun in his T-shirt.

Jackman demanded Boetius go back up to Rodriguez's room and "take the money and the drugs." As Boetius began to walk up the stairs to Rodriguez's room, however, she, Jackman, and Defendant saw a police car turning into the Inn parking lot. Upon seeing the police car, Jackman ran from the lot and was eventually caught and arrested by Officer Elvir Redzepovic of the Charlotte-Mecklenburg Police Department. Meanwhile, Boetius ran back to Varra's room where she was joined by Defendant, Varra, and Franklin. Defendant and Varra left the room briefly and, upon returning, told her that Rodriguez was dead.

Defendant and Boetius then decided to leave the scene of the crime by climbing over a wall located at the back of the Inn

parking lot. Before climbing the wall, Defendant put both his gun and Jackman's gun — still wrapped in Jackman's T-shirt — into Boetius's pocketbook. They then fled the area, proceeding to an apartment complex where they sat and waited on the curb until an unknown individual who was driving by asked them if they wanted a ride. Defendant and Boetius got into the car, and the individual began driving. While in the car, Defendant took his and Jackman's guns from Boetius's pocketbook. Defendant was still in possession of the firearms when he was dropped off per his instructions at "[t]he Plaza across the street from the BP."

Later that same day, the Charlotte-Mecklenburg Police Department received information that Defendant was trying to sell a firearm. Detective Terrence Gerald ("Detective Gerald") of the Charlotte-Mecklenburg Police Department, who was working undercover, arranged to meet Defendant in the parking lot of the Wal-Mart on Eastway Drive, where he purchased the gun from Defendant. The gun was later identified by Mr. Todd Nordhoff, a firearm and tool mark examiner with the Charlotte-Mecklenburg crime laboratory, as the gun that had been used to shoot and kill Rodriguez. Immediately after the sale, Defendant was arrested and taken to the Law Enforcement Center to be interviewed.

After being read his *Miranda* rights and waiving them, Defendant, during the course of an interview with Detectives

Todd Burkard ("Detective Burkard") and J.A. Sterrett ("Detective Sterrett"), disclosed that he had been in Rodriguez's room either during or immediately after Rodriguez's murder.

On 1 August 2011, Defendant was indicted on one count of first-degree murder and one count of attempted robbery with a dangerous weapon. A jury trial was held in Mecklenburg County Superior Court on 5 November 2012.

Defendant testified in his own defense at trial. His testimony presented the following account of the events of 23 July 2011: Defendant met with Varra, Jackman, Franklin, and Boetius at the Inn, and the group ultimately decided to rob Rodriguez. Defendant's only role in the planned robbery was to take any drugs and money he found in Rodriguez's room while Jackman held up Rodriguez. Boetius's and Franklin's roles in the planned robbery were to distract Rodriguez, thereby enabling Defendant and Jackman to enter Rodriguez's room and catch him by surprise.

As Defendant and Jackman were approaching Rodriguez's room and were roughly two feet away from the door, Defendant saw that Boetius was walking out of the room. Because her departure from Rodriguez's room was not part of the plan, Defendant became "real nervous" and "punked out." Defendant further explained that "[b]y punked out, I mean like I didn't follow out the plan, I gave up, got nervous. I wasn't down with it no more, I just

kept walking."

Without saying anything to Jackman — who, according to Defendant, was already ahead of him and walking into Rodriguez's room — or the other conspirators, Defendant proceeded to abruptly turn away from the door and head down a staircase located next to Rodriguez's room. As he was walking down the stairs, Defendant heard a single gunshot. He then ran down the remaining stairs and out into the parking lot, ultimately returning to Varra's room where he met up with Boetius and Franklin. Shortly thereafter, Jackman returned to Varra's room and informed Defendant, Boetius, and Franklin that he had shot Rodriguez in the heart and that Rodriguez was dead.

Jackman then took the gun he had used to shoot Rodriguez and wrapped it in a pillowcase from Varra's room as well as the T-shirt Jackman had been wearing. Jackman placed the parcel in Boetius's purse. Defendant then fled over the back wall of the Inn parking lot with Boetius and eventually got a ride away from the scene in the minivan of a friend whom Boetius had called. While in the back of the minivan, Defendant admitted to taking Jackman's gun from Boetius's purse.

Later that day, Defendant "put the word out" that he had a gun to sell. Defendant subsequently sold the gun to Detective Gerald. With regard to his subsequent interrogation by Detectives Burkard and Sterrett, Defendant testified that —

contrary to his statements during the recorded interrogation which was played for the jury at trial — he had not been in Rodriguez's room at any point. He further stated that he had been deliberately untruthful with Detectives Burkard and Sterrett because he thought they would allow him to leave if he told them what he believed they wanted to hear. Defendant claimed that he would never have lied during his interrogation if he had been aware of the felony murder rule and the theory of acting in concert.

Defendant was convicted of (1) felony murder; and (2) attempted robbery with a firearm. The trial court arrested judgment on Defendant's attempted robbery with a firearm conviction and sentenced him to life imprisonment with the possibility of parole after 25 years of incarceration for first-degree felony murder. Defendant gave notice of appeal in open court.

**Analysis**

**I. Instruction on Withdrawal**

Defendant's first argument on appeal is that the trial court erred in failing to instruct the jury concerning the defense of withdrawal. Defendant did not specifically request an instruction about withdrawal at trial. Therefore, we review this issue only for plain error. *State v. Loftin*, 322 N.C. 375, 380, 368 S.E.2d 613, 616 (1988) (holding that plain error

standard of review is applied on appeal to unpreserved arguments concerning jury instructions).

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice — that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity or public reputation of judicial proceedings.

*State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (internal citations, quotation marks, and brackets omitted). Furthermore, our Supreme Court has established that "[a] prerequisite to our engaging in a 'plain error' analysis is the determination that the instruction complained of constitutes 'error' at all." *State v. Torain*, 316 N.C. 111, 116, 340 S.E.2d 465, 468, *cert. denied,* 479 U.S. 836, 93 L.Ed.2d 77 (1986).

Therefore, we must first determine whether the trial court's omission of the withdrawal instruction was erroneous. During the jury charge, the trial court instructed the jury with respect to the attempted robbery with a dangerous weapon charge under a theory of acting in concert. The trial court then instructed the jury on felony murder predicated on the underlying felony of attempted robbery with a dangerous weapon.

The doctrine of acting in concert provides that

> [i]f two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose . . . or as a natural or probable consequence thereof.

*State v. Herring*, 176 N.C. App. 395, 399, 626 S.E.2d 742, 745 (citation omitted), *appeal dismissed and disc. review denied*, 360 N.C. 651, 637 S.E.2d 183 (2006), *cert. denied*, 549 U.S. 1293, 167 L.Ed.2d 342 (2007). Thus, "[t]he acting in concert doctrine allows a defendant acting with another person for a common purpose of committing some crime to be held guilty of a murder committed in the pursuit of that common plan even though the defendant did not personally commit the murder." *State v. Roache*, 358 N.C. 243, 306, 595 S.E.2d 381, 421 (2004).

North Carolina law does recognize that it is possible for a defendant to withdraw from a criminal enterprise and thereby establish an affirmative defense to criminal liability. *See State v. Wright*, 210 N.C. App. 697, 700, 709 S.E.2d 471, 473-74 (2011) (explaining that "[o]nce an individual has joined in a purpose to commit a crime, it is possible for him to withdraw under certain circumstances"). However, in order to actually withdraw from a criminal enterprise, a defendant must clearly manifest such an intention by plainly and unambiguously

renouncing his participation in the crime to his accomplices. *Id.* Without such an express renunciation of the common plan or scheme, a defendant will be deemed to have remained an active participant in the criminal enterprise under the theory of acting in concert.

> Where the perpetration of a felony has been entered on, one who had aided or encouraged its commission cannot escape criminal responsibility by quietly withdrawing from the scene. The influence and effect of his aiding or encouraging continues until he renounces the common purpose and makes it plain to the others that he has done so and that he does not intend to participate further.

*State v. Spears*, 268 N.C. 303, 310, 150 S.E.2d 499, 504 (1966); *see also State v. Wilson*, 354 N.C. 493, 508, 556 S.E.2d 272, 282 (2001) ("Although *Spears* dealt with the law of aiding and abetting, we hold that for the purposes of acting in concert the above statement is equally applicable to withdrawal from a common plan."), *overruled on other grounds by State v. Millsaps*, 356 N.C. 556, 572 S.E.2d 767 (2002). "Any withdrawal by a defendant may not be done silently in his own mind without any outward manifestation or communication to the other perpetrators." *Wright*, 210 N.C. App. at 700, 709 S.E.2d at 474.

Defendant's testimony at trial tended to establish that he was present during at least some part of the discussion and planning of the robbery. Furthermore, Defendant testified that

(1) he was walking with Jackman towards Rodriguez's room at the Inn for the purpose of robbing Rodriguez; (2) after Jackman had pushed past him into Rodriguez's room with his gun drawn, Defendant "punked out" — meaning that he no longer wished to participate in the robbery; (3) at that point, he turned and walked down the stairwell by Rodriguez's room without verbalizing or alerting Jackman or any of the others that he was abandoning the plan of robbing Rodriguez; (4) he heard a gunshot; (5) shortly thereafter, he met with Jackman, Franklin, and Boetius in Varra's room; (6) Jackman admitted that he had shot Rodriguez; (7) he fled the scene with Boetius; (8) he took the gun used to shoot Rodriguez out of Boetius's purse where it was hidden; and (9) he thereafter sold that same gun to Detective Gerald.

Even if Defendant walked away from Rodriguez's room and down a flight of stairs, he did not expressly inform his accomplices that he was withdrawing from the robbery. In *Wright*, we rejected the defendant's argument that "he communicated his withdrawal by physically leaving the scene and returning to the getaway vehicle for the remainder of the incident," holding that the defendant "failed to verbally communicate any intent to withdraw to [the other perpetrators] when he returned to the vehicle" and thus was not entitled to an instruction on withdrawal. *Wright*, 210 N.C. App. at 701, 709

S.E.2d at 474. We believe the same result is required here.

Because Defendant did not expressly renounce his participation in the criminal enterprise, he failed to satisfy the prerequisites for a withdrawal instruction. The trial court's decision not to give such an instruction, therefore, did not constitute error — much less plain error. Consequently, Defendant's argument with respect to this issue is overruled.

## II. Ineffective Assistance of Counsel

Defendant's final argument on appeal is that his trial counsel's failure to request an instruction concerning withdrawal amounted to ineffective assistance of counsel.

> To prevail on a claim of ineffective assistance of counsel, a defendant must first show that his counsel's performance was deficient and then that counsel's deficient performance prejudiced his defense. Deficient performance may be established by showing that counsel's representation fell below an objective standard of reasonableness. Generally, to establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

*State v. Rodelo*, ___ N.C. App. ___, ___, 752 S.E.2d 766, 773 (2014) (internal citations and quotation marks omitted).

As discussed above, the evidence Defendant presented at trial was legally insufficient to support a jury instruction concerning withdrawal. Consequently, the failure of Defendant's

trial counsel to request such an instruction cannot logically support a claim of ineffective assistance of counsel.

## Conclusion

For the reasons stated above, we conclude that Defendant received a fair trial free from error.

NO ERROR.

Judges HUNTER, JR. and ERVIN concur.

Report per Rule 30(e).